**BEATTIE PADOVANO, LLC**
Attorneys for Plaintiff EJ MGT LLC
Edward R. Grossi
Martin R. Kafafian
50 Chestnut Ridge Road, Suite 208
Montvale, New Jersey 07645
(201) 573-1810
egrossi@beattielaw.com
mrk@beattielaw.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EJ MGT LLC,<br><br>                     Plaintiff,<br><br>    v.<br><br>ZILLOW GROUP, INC., and ZILLOW, INC.,<br><br>                     Defendants. | Case No. _____<br><br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff EJ MGT LLC, a limited liability company organized under the laws of the State of New Jersey, by its attorney, Beattie Padovano, LLC, 50 Chestnut Ridge Road, Suite 208, Montvale, New Jersey 07645, by way of Complaint against Zillow Group, Inc., and Zillow, Inc. (collectively, "Defendants" or "Zillow"), with headquarters located at 1301 Second Avenue, Seattle, Washington, allege as follows:

**I.     INTRODUCTION**

1.  This antitrust action arises from Zillow's conspiracy with certain real-estate brokerage companies to selectively conceal "Zestimates."

2.   Zillow publishes millions of Zestimates—Zillow's estimate of a residential property's "fair market value"—which they know to be inaccurate, and have allowed only select brokers to conceal the display of Zestimates on their listings to the exclusion of the general public.

3.   These agreements between Zillow and certain co-conspirator brokers of residential real estate ("Co-conspirator Brokers") restrain trade and deprive Plaintiff and the public in general of the benefits of open and robust competition in two markets: the residential-real-estate market and the residential-real-estate-brokerage market.

4.   Together, Zillow and the Co-conspirators Brokers have made anticompetitive, unconscionable, and otherwise illegal agreements regarding the display of the Zestimate on Zillow's website for properties listed through the Co-conspirator Brokers.

5.   The Zillow Defendants are media companies that operate, among other ventures, an online residential-real-estate database, which is publically available at the URL "www.zillow.com" and its subpages (the "Zillow Website").

6.   The Zillow Website aggregates information on over 100 million homes across the United States, with a page ("Residence Page") designated for each of the 100-million-plus homes. Each Residence Page displays information about the subject residence, such as property taxes information, public school districting, and lot dimensions. Each Residence Page is available to and accessible by the public.

7.   Each and every Residence Page—including homes listed for-sale and off-market homes—contains a valuation estimate known as the Zestimate. Zillow claims the Zestimate is an "estimate of market value."

8.  Zillow markets its Zestimate as a "user-friendly format to promote transparent real-estate markets and allow people to make informed decisions" in the home-buying process. But the Zestimate is often (if not always) inaccurate, and Zillow knows the Zestimate to be inaccurate.

9.  The Zestimate is prominently displayed on most Residence Pages, and is among the first pieces of information listed on each of them. But through illegal agreements, Zillow has conspired with the Co-conspirator Brokers to conceal the knowingly misleading and inaccurate Zestimates on the Residence Pages for their listings so that the Zestimate is not prominently displayed and not in frame when an internet user lands on a given Residence Page. Alternatively, Residence Pages for homes listed by (i) other brokers, (ii) agents who are not affiliated with the Co-conspirators ("Unaffiliated Broker/Agent"), and (iii) individual home owners who have not hired agents affiliated with the Co-conspirator Brokers are left with no choice but to have the inaccurate or otherwise misleading Zestimates appear prominently on those Residence Pages.

10. Zillow has acknowledged that it conceals Zestimates as a result of agreements with only "certain brokers," who in turn receive a "certain treatment":



**Courtney H** (Zillow Help Center)
May 25, 7:52 AM PDT

Hi Igor,

Due to agreements Zillow has with certain brokerages, the Zestimate may not display under the listing price on these brokers' listings. It will however still display on the listing under Zestimate details, just not directly under the price. Zillow Group does not completely remove Zestimates for any listing, but there are contracts in place for some brokers to receive a certain treatment. I apologize I am unable to edit or remove the Zestimate on your listing as these agreements and modifications are outside my administrative capabilities.

If I can be of assistance moving forward, please let me know.

Thanks and have a wonderful rest of your week!

Courtney
Agent Care Consultant
Premier Agents: 1-888-466-3501
Zillow Group

3020399_5\180029

11. Plaintiff EJ MGT LLC owns and is presenting and marketing property located at 142 Hoover Drive, Cresskill, New Jersey ("142 Hoover") through an Unaffiliated Agent.  As a result, the Residence Page for 142 Hoover contains a prominently displayed Zestimate, while the Residence Page of another property in nearby Alpine, New Jersey listed through a Co-conspirator Broker, conceals the Zestimate:





3020399_5\180029

12. These illegal agreements are further evidenced by comparing (i) the Residence Page for a property while it was listed with a Co-conspirator Broker and (ii) the Residence Page for the same property once the property is off market. Below is the Residence Page for certain property captured on January 2, 2018, after that property had been taken off market, with a prominently displayed Zestimate. Below that is the Residence Page for the same property captured less than a week earlier (December 26, 2017) while listed for sale by Sotheby's with a concealed Zestimate:



5

13. In essence, Zillow is disseminating misleading and inaccurate pricing information that has gained prominence because of Zillow's market power, and charging downstream participants to hide this negative information that Zillow, itself, acknowledges to be inaccurate. Further, members of the public have no way to prevent Zillow from obtaining this information, and they cannot alter its display once Zillow presents it unless they hire a broker that is party to the Zestimate Agreement.

14. Zillow does not offer these agreements to all brokers, and has explicitly refused to offer this option to individual home owners and agents that are not affiliated with any of the Co-conspirator Brokers.

15. The manner in which Zillow has implemented this anticompetitive feature of its platform alters the workings of the market, inhibits the open flow of information (that Zillow itself created through developing the Zestimate based on the manipulation of public data), and excludes certain brokers and homeowners from the select few that can choose how the Zestimate is displayed on their listing page.

16. These agreements restrain trade in connection with the exchange of information regarding home valuation and provide anticompetitive benefits to only those select brokers that are given the opportunity to purchase a service package from Zillow that conceals the Zestimate to the detriment of the excluded brokers, agents, and homeowners.

17. Plaintiff brings this action to prevent Defendants and certain Co-conspirator Brokers from imposing on brokers, agents and individual sellers of real estate certain rules, polices, and practices regarding the display of Zestimates ("Zestimate Agreements") that insulate the Co-conspirator Brokers from competition and allow them to manipulate the market for the purchase and sale of residential real estate. Zestimate Agreements impede brokers from fairly competing

in the market for residential real estate listings, impede agents unaffiliated with the Co-conspirators Brokers from fairly competing in the market for residential real estate listings, create and heighten barriers to entry, and impede the individual homeowners from fairly selling a home where competing against the listings by Co-conspirators Brokers who have the benefit of the Zestimate Agreements. Each co-conspirator's vertical Zestimate Agreements are directly aimed at restraining horizontal competition in the listing and sale of residential real estate.

18. Most buyers of real estate go online and compare Zestimates of various homes. Zestimate Agreements, however, conceal Zestimate scores for only certain listings by certain brokers, and also prevent certain brokers, agents and individuals from being permitted to alter the display of the Zestimate on their listings. In short, Zestimate Agreements unlawfully interfere with an open market by impeding the flow of information.

19. The Defendants and the co-conspirators have suppressed competition with rival brokers, agents and sellers of homes by disrupting the flow of information and impeding buyers' access to Zestimates of homes that they would otherwise more readily view without the imposition of Defendants' anticompetitive practices.

20. By incorporating and agreeing to conceal the Zestimate, each Defendant and the Co-conspirator Brokers have violated and continue to violate Section 1 of the Sherman Act, 15 U.S.C. § 1 and the New Jersey Antitrust Act, N.J.S.A. 56:9-3.

21. Also, by creating and disseminating the Zestimate—which Zillow itself acknowledges is false, inaccurate, or otherwise misleading—and then allowing only certain actors to alter its display, Zillow has violated New Jersey's prohibitions against unconscionable business practices, product disparagement or slander of title, and tortious interference with a prospective economic advantage.

7

## II.      PLAINTIFF

22. Plaintiff EJ MGT LLC is a limited liability company organized under the laws of the State of New Jersey with an address of 50 County Road, Cresskill, New Jersey.  EJ MGT LLC is the titled owner of a certain property, which is improved with a single-family home, located at 142 Hoover Drive, Cresskill, New Jersey.

## III.     DEFENDANTS

23. Defendant Zillow, Inc. is a corporation formed under the laws of the State of Washington, with its headquarters located at 1301 Second Avenue, Seattle, Washington.

24. Defendant Zillow Group, Inc., is a corporation formed under the laws of the State of Washington, with its headquarters located at 1301 Second Avenue, Seattle, Washington.

25. Zillow Group was incorporated in 2014 in connection with Zillow's acquisition of its competitor, Trulia, an online residential real estate site for home buyers, sellers, renters and real-estate professionals that lists properties for sale and rent as well as provides tools and information used in the home search process.

26. Zillow is a wholly owned subsidiary of Zillow Group.

## AGENTS AND CO-CONSPIRATORS

27. Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

28. Various other persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this

8

Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

29. Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## IV.   JURISDICTION AND VENUE

30. Plaintiff brings this action pursuant to the Sherman Act 15 U.S.C. § 1, and pursuant to Sections 15 and 26 of the Sherman Act and Clayton Act, as amended, 15 U.S.C. §§ 4, 26 to obtain damages, equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pursuant to New Jersey Law.

31. This Court has subject-matter jurisdiction over this action under Sections 15 and 26 of the Sherman Act and Clayton Act, 15 U.S.C. §§ 15, 26, and with respect to the violations of New Jersey law, this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

32. This Court has subject-matter jurisdiction over the violations of New Jersey law pursuant to 28 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

33. Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391 (b), (c), and (d), because one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial

portion of the affected interstate trade and commerce (discussed below) has been carried out in this District. Defendant's listings are and have been used for thousands of real-estate transactions in this District.

34. This Court has personal jurisdiction over the Defendants because each, either directly, or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in New Jersey, including in this District; (b) directly or indirectly sold or marketed real-estate listing services or real-estate brokerage services in New Jersey, including in this District; (c) had substantial aggregate contacts with New Jersey, including this District; or (d) were engaged in an illegal conspiracy in restraint of trade that was directed at, and hard a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business in New Jersey, including this District. Defendants also conduct business throughout the United States, including in New Jersey and this District, and have purposefully availed themselves of the laws of New Jersey.

## V.     TRADE AND COMMERCE

35. Defendants operate listing services, monetize ad units on its website that reaches internet users across state lines, and/or offer services in the United States in the flow of interstate commerce. Defendants' products and services have a substantial effect on at least three elements of interstate commerce: (1) the financing of real-estate transactions; (2) the title-insurance business; and (3) the interstate movement of people.

10

## VI.    INDUSTRY BACKGROUND

36.    Zillow's stated mission is to "build the largest, most trusted and vibrant home-related marketplace in the world."  Zillow operates a website in nearly every vertical market related to residential real estate. The Defendants operate a number of consumer and business brands, all focusing on aspects of the home lifestyle: renting, buying, selling and financing. The Defendants' portfolio of consumer brands includes real-estate and rental marketplaces Zillow, Trulia, StreetEasy, HotPads and Naked Apartments. The Defendants also own and operate a number of brands for real estate, rental and mortgage professionals, including Mortech, dotloop, Bridge Interactive and Retsly.

37.    The Zillow Website is the Defendants' flagship offering and the market leader in the online-real-estate-database space. According to comScore (a web analytics company that ranks the popularity of websites), for the month of June 2017, the Zillow Website was the 24th most popular website in the world and the leading website in the real-estate sector. According to Zillow's 2016 Annual Statement, during the last three months of 2016, Zillow and its affiliate sites averaged over 140 million unique monthly users.

38.    In addition to being a market leader among competitor websites (the biggest of which was acquired by Zillow in 2014), Zillow essentially owns the search-engine-optimization results for individual street addresses. When a street address is entered into Google's or Bing's search engine, the first result is Zillow's Residence Page for that address. For example, when "142 Hoover Drive Cresskill New Jersey" is entered into Google Search's algorithm, the first hit is the Zillow Residence Page for 142 Hoover.

11

39.     The Defendants' financial model depends on revenue generated primarily through the sale of advertising products and services to real-estate agents and brokers, rental professionals, mortgage professionals and other advertisers in categories relevant to real estate.

40.     Zillow also works with tens of thousands of real-estate agents, lenders and rental professionals to, among other things, connect those professionals with Zillow's millions of consumers.

41.     Zillow has compiled a self-described "inimitable" database of residences. It claims that this database includes detailed information on more than 110 million U.S. homes, and includes homes for sale, for rent and recently sold, as well as properties not currently on the market. It claims that this database is central to the value Zillow provides to consumers and real-estate, rental, and mortgage professionals.

42.     Zillow aggregates extensive information that users can search, through an easy-to-use interface, to identify, analyze and compare homes.

43.     Zillow claims that the database is relevant to a broad range of users, including buyers, sellers, renters, homeowners, real-estate agents and other real-estate professionals.

44.     Zillow's database, which is reflected on the Zillow Website's Residence Pages. includes information such as:

> a.  Property facts: Zestimate and its corresponding value range, number of bedrooms, number of bathrooms, square footage, lot size, assessed tax value and property type such as single-family, condominium, apartment, multifamily, manufactured home or land.
>
> b.  Listing information: price, price history and reductions, dollars per square foot, days on the market, listing type (such as for sale by agent, for sale by owner, pre-

market inventory, which includes foreclosure, pre-foreclosure, Coming Soon and

Make Me Move listings, new construction and rental homes), open houses,

property photos and estimated monthly mortgage payment.

    c.    Purchase and sale data: prior sales information and recent sales nearby.

45.    A key piece of information that appears on each Zillow listing is the Zestimate.

Zillow describes the Zestimate as its own self-prepared estimate of current market value of a

home using a variety of information, including:

    a.    Physical attributes: location, lot size, square footage, number of bedrooms and

bathrooms and many other details.

    b.    Tax assessments: property tax information, actual property taxes paid, exceptions

to tax assessments and other information provided in the tax assessors' records.

    c.    Prior and current transactions: actual sale prices over time of the home itself and

comparable recent sales of nearby homes.

    d.    User data: data provided directly by millions of users of our mobile applications

and websites.

46.    According to Zillow, the Zestimate home valuation is Zillow's estimated market

value of a property.

47.    Zillow has represented that the intent of the Zestimate is for it to be used by those

in the home-buying market as a starting point to determine a home's value.

48.    Zillow states that it provides this information to its users where, when, and how

they want it.

49.    While Zillow's primary revenue source is advertising dollars, it is also in the

business of matching brokers with both buying and selling consumers. Zillow presents

13

consumers with ratings and contact information for the listing agent and local buyer's agents alongside home profiles and listings for homes to assist them in evaluating and selecting the real-estate agent best suited for them.

50.     Zillow's two primary revenue categories are its marketplace revenue and display revenue.

51.     It describes its marketplace revenue as Premier Agent revenue, other real-estate revenue, and mortgages revenue.

52.     Zillow explains that Premier Agent revenue is generated by the sale of advertising under its Premier Agent program, which offers a suite of marketing and business technology products and services to help real-estate agents grow their businesses and personal brands offered on a cost-per-impression basis.

53.     When describing this program, Zillow conceals the fact that it offers a separate tier of membership that involves agreements or contracts with only certain brokerages to conceal or otherwise alter the manner in which the Zestimate is displayed on a Zillow Residence Page.

54.     While it is unknown when Zillow began implementing the Zestimate Agreements, Zillow reported a 30% increase in Premier Agent revenue from the three months ended March 31, 2016 to the three months ended March 31, 2017.

## VII.   RESTRAINTS ON COMPETITION

55. Technology implemented by Zillow has allowed for the ability to easily and conveniently share information about real estate and has given consumers unprecedented access to this information.

56. Zillow has been able to implement and develop the Zestimate only because of the open and widespread availability of this information.

57. Zillow openly represents and markets that the Zestimate is used by buyers and sellers as a starting point for considering the price of a home, and that the purpose of the Zestimate is to provide data in a user-friendly format to promote transparent real-estate markets and allow people to make informed decisions.

58. Zillow has also represented that it is committed to transparency as it relates to the Zestimate and valuation accuracy, or lack thereof.

59. As of at least January 5, 2015, Zillow understood that its Zestimate caused issues or concerns among real-estate brokers and their clients: "The Zestimate conversation: some real-estate agents avoid it; others conquer it. The conquering crowd would tell you they see the Zestimate as an opportunity [ ] to distinguish themselves as local experts around town. They're the Zestimate whisperers." (The Zestimate Home Value Explained, Premier Agent Resources, January 5, 2015, available at https://www.zillow.com/agent-resources/trends-and-data/tips-and-advice/the-zestimate-explained/)

60. In contravention of its stated commitment to transparency regarding the Zestimate, Zillow has agreed to conceal the manner in which it displays Zestimates on certain webpages for only certain brokers.

61. To the exclusion of individual home owners and other brokers who are not parties to the Zestimate Agreements, Zillow will permit only certain brokers and those agents affiliated with only certain brokers to alter the display of the Zestimate so that it does not appear at the top of the listing's page.

62. At the very least, it can be inferred that Zillow has entered into agreements with the following co-conspirators who are parties to certain agreements to conceal Zestimates on their listings (collectively, "Co-Conspirators"):

      a.   Sotheby's International Realty, Inc. ("Sotheby").

      b.   Coldwell Banker Real Estate LLC ("Coldwell Banker")

      c.   Century 21 Real Estate LLC ("Century 21");

      d.   The Corcoran Group ERA ("Corcoran");[1] and

      e.   Weichert Realty.

63. Through its dominant market position, Zillow has injured consumers and restrained competition by entering into agreements with the Co-Conspirators that allow for the limited, altered, or otherwise concealed display of the Zestimate for only the listings of agents affiliated with the Co-Conspirators:

---

[1] Sotheby's, Coldwell Banker, Century 21, and Corcoran are wholly owned subsidiaries of Realogy

a.  The Zillow Residence Page for a typical Sotheby's listing as of January 2, 2018

displays as follows, with concealed Zestimates:



b.   The Residence Page for a typical Coldwell Banker listing as of January 2, 2018

displays as follows, with concealed Zestimates:



c.  The Residence Page for a typical Century 21 listing as of January 2, 2018 displays as follows, with concealed Zestimates:



d.  The Residence Page for a typical Corcoran listing as of January 2, 2018 displays

as follows, with concealed Zestimates:



e.   The Residence Page for a typical Weichert Realtors listing as of January 2, 2018

displays as follows, with concealed Zestimates:



3020399_5\180029

f.    By contrast, the Residence Page for 142 Hoover, as of January 2, 2018, display as

follows, with a prominently displayed Zestimate:



64. Zillow has acknowledged that the concealment of the Zestimates above occurred as the result of certain agreements with only certain brokers:

 **Courtney H** (Zillow Help Center)
May 25, 7:52 AM PDT

Hi Igor,

Due to agreements Zillow has with certain brokerages, the Zestimate may not display under the listing price on these brokers' listings. It will however still display on the listing under Zestimate details, just not directly under the price. Zillow Group does not completely remove Zestimates for any listing, but there are contracts in place for some brokers to receive a certain treatment. I apologize I am unable to edit or remove the Zestimate on your listing as these agreements and modifications are outside my administrative capabilities.

If I can be of assistance moving forward, please let me know.

Thanks and have a wonderful rest of your week!

Courtney
Agent Care Consultant
Premier Agents: 1-888-466-3501
Zillow Group

3020399_5\180029

65. Zillow has explained that a Zestimate can only be removed by a "Premier Agent":



**Richard** (Zillow Help Center)
Dec 28, 4:40 PM PST

Hi Elliott,

Unfortunately this feature is only available on our premier agent program for real estate agents. You can pass this information to your agent to inquire further about our Premier Agent program:
http://agents.zillow.com/get-more-leads-premier-agent-branded?
utm_source=google&utm_medium=cpc&utm_campaign=zaw_br_branded_nat!c73dhg33&utm_term=Branded_Premier_Agent_Zillow_Exact~premier%20agent%20zillow-e_kwd-
365771798557_c_g&utm_content=230543502880_9033305_.adpos1t1_%7C91ec3adf-cbd4-4245-aebb-313c2a8267c1

Thank you for using Zillow!

Richard
Zillow Consumer Care
https://zillow.zendesk.com/hc/en-us



**Elliott**
Dec 28, 2:45 PM PST

Hi Richard,

Thank you for the explanation. Can I as a homeowner enter into a partnership with Zillow to display a listing page differently? If so, I'm interested in learning more about how I can have my listing page not show the Zestimate on the top right but rather lower down in the page, as in the example that I sent you. I'd also like to know if there is a fee and if so what that fee is.

Thank you,

Elliott



**Richard** (Zillow Help Center)
Dec 28, 11:52 AM PST

Hi Elliott,

Sorry for the late response. Zillow will display a Zestimate on every property page that we have enough data points to run our algorithmic function on.  Zillow has various partnerships with Agents, Brokerages, and Vendors that may display a listing page differently than others.  If a Zestimate value is available, it will always appear on the listing page.

Thank you for using Zillow!

Richard
Zillow Consumer Care
https://zillow.zendesk.com/hc/en-us

66. However, even Premier Agents cannot conceal the display of the Zestimate unless they are affiliated with a brokerage that is party to the Zestimate Agreements.

67. Thus, at some point Zillow determined that it could profit through its manipulation and presentation of public data through the display of Zestimates by allowing certain brokers, who had neither the time nor inclination to become "Zestimate whisperers," to pay in order to avoid the confusion caused by a prominently displayed Zestimate on a Zillow listing.

68. These practices conceal information from consumers and force them to acquire this information in either a more costly manner or foregoing it altogether.

3020399_5\180029

69. Zillow neither publicizes the existence of the Zestimate Agreements nor openly discloses that it is willing, only for certain parties, to conceal and alter the display of a Zestimate.

70. The Zestimate Agreements also restrict the manner in which homeowners are able to market or advertise their properties, as Zillow does not offer a homeowner option to either remove the listing from Zillow or alter the location of the display of the Zestimate on their own.

71. Zillow has expressly refused Plaintiff's request that his Zestimate be treated in the same manner as those listings of the Co-conspirators.

72. This concerted and effective effort to withhold or limit the display of Zestimates for only select Residence Pages of for-sale properties listed with only certain brokers disrupts the proper functioning of the price-setting mechanism of the market, reduces incentives to compete of those brokers who are a party to the Zestimate Agreements, and imposes increased and unjustified costs on the excluded brokers and homeowners in the sale of their homes who must pay additional fees to Zillow or brokers that are party to the Zestimate Agreements if they want to be placed on equal footing with the these brokers and their agents who are able to have the display of the Zestimate on their listings concealed.

## VIII.   HARM TO COMPETITION

73. Zillow describes itself as the operator of the leading real estate and home-related information marketplace on the web. It operates a broad portfolio of consumer brands related to the listing of residential real estate and rental marketplaces, including Zillow, Trulia, StreetEasy, HotPads, Naked Apartments, and HREO.

74. Zillow also states that it works with tens of thousands of real-estate agents, lenders, and rental professionals.

75. Zillow also owns and operates a number of brands for real estate, rental, and mortgage professionals, including Mortech, dotloop, and Bridge Interactive.

76. Zillow's "living database" of more than 110 million U.S. homes has resulted in the creation and dissemination of exclusive home profiles not available anywhere else.

77. Zillow operates in the real-estate portal product market. It enters into arrangements, agreements, and in this case conspiracies in restraint of trade, with real-estate brokers and agents offering services in the field of real-estate listings.

78. The conduct, operations, and agreements between Zillow and the Co-Conspirators impacts relevant local geographic markets around the country, including the Northern New Jersey Metropolitan Real Estate market, in which Plaintiff's property is located.

79. Zillow's and the Co-Conspirator's actions involve and impact the product market for real estate, real-estate listings, and real-estate portals in both national and local markets.

80. The public interest and competition in general is served by the gathering and dissemination in the widest possible manner of information with respect to costs and prices of actual sales in a market.

81. The making available of such information tends to stabilize trade and industry, produce fairer price levels, and avoids waste that inevitably attends the unintelligent conduct of economic enterprise.

82. Restraint upon free competition begins when improper use is made of information through any concerted action which operates to restrain the freedom of action of those who buy and sell.

83. The vertical Zestimate Agreements are directly aimed at restraining horizontal competition in both the market for the sale of residential real estate and for the listing of residential real estate. Each Defendant's actions restrains and harms competition by:

    a.   Harming the competitive process and disrupting the proper functioning of the price-setting mechanism and information exchange of a free market;

    b.   Insulating brokers (and their agents) that are party to the Zestimate Agreements from competition from rival sellers that would otherwise fairly compete for listings;

    c.   Causing increased prices in the form of advertising fees, brokers commissions, or other costs incurred solely to alter or conceal the display of Zestimates;

    d.   Depriving consumers of access to price information as displayed in the Zestimate; and

    e.   Imposing barriers to entry in the listing and sale of residential real estate

84. Defendants' actions substantially reduce price and non-price competition for brokerage services and the sale of real estate. Without these practices, many brokers and sellers would be faced with an equal playing field regarding the listing of their properties, display of the Zestimate, and potential buyers' reactions to it.

85. Without the Zestimate Agreements, each Co-conspirator Broker would compete more vigorously. But by imposing the restraints, Zillow has permitted the Co-conspirator Brokers to insulate themselves from competition with each other and with other brokers. The restraints reduce incentives for the Co-conspirator Brokers to competitively list their properties and otherwise free them from other practices and concerns that other brokers and individual home sellers must  address when faced with a prominently displayed Zestimate.

86. The Zestimate Agreements are plainly anticompetitive and lack any redeeming virtue and are presumed to be illegal.

87. An observer with even a rudimentary understanding of economics could conclude that the Zestimate Agreements would have an anticompetitive effect on customers and markets.

88. There exists no competitive justification for the Zestimate Agreements.

## IX.     142 HOOVER DRIVE

89. Plaintiff EJ MGT LLC is the titled owner of 142 Hoover Drive, Cresskill, New Jersey. 142 Hoover measures 1.5 acres and is improved with a single-family home measuring 18,000 square feet.

90. EJ MGT LLC acquired 142 Hoover in or around March of 2015.  At that time, after years of neglect, the property and single-family home were in a state of disrepair.  EJ MGT LLC acquired the home with the intention to restore this home to its former glory.

91. EJ MGT LLC spent significant time and resources renovating and refurbishing the single family residence and grounds.

92. In January 2017, 142 Hoover was listed for sale, with Keller Williams being the broker/listing agent.

93. When Keller Williams's listings appear on the Zillow Website, the Zestimate is not concealed and, therefore, prominently displayed. Since at least January 2017, the Zestimate for 142 Hoover has been prominently displayed on that property's Residence Page.

94. EJ MGT LLC has been unable to sell 142 Hoover. Potential buyers have advised EJ MGT LLC's agents and/or representatives that the difference between the Zestimate and the listing price has impacted and/or informed their decision not to purchase 142 Hoover.

95. Agents and representatives, on behalf of EJ MGT LLC, requested that the listing for 142 Hoover be treated in the same manner as those listings of the Co-Conspirators.

96. Zillow refused to deal with the agents and representatives of EJ MGT LLC, advising that the ability to conceal the Zestimate was subject to agreements between Zillow and certain brokerage houses. Further, Zillow has not revised the Zestimate for 142 Hoover.

## X.      COUNTS/VIOLATION ALLEGED

## COUNT ONE: CONSPIRACY TO RESTRAIN TRADE
## (15 U.S.C. § 1)

97. Each Defendants' actions constitute agreements that unreasonably restrain competition in the market for the sale of real estate and in the market for real-estate listing in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

98. These agreements have had and will continue to have anticompetitive effects by protecting the Broker Defendants from competition over the listing and sale of real estate, restraining other brokers, agents, and individual sellers from advertising and marketing their properties on Zillow on the same terms as the Broker Defendants, imposing barriers to entry, and otherwise by restraining the flow and exchange of information in the market. Defendants' actions unlawfully insulate the Co-Conspirator Brokers from competition, increase transaction costs and prices, reduce output, harm the competitive process, raise barriers to entry and expansion, and retard innovation.

99. These agreements are not reasonably necessary to accomplish any of Defendants' allegedly procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Defendants would be able to reasonably achieve any procompetitive goals.

100.       Plaintiff has been injured and will continue to be injured in their business and property by taking longer to sell its property, receiving less for its property, and otherwise incurring lost profits in connection with the sale of 142 Hoover because of the presence of a prominently displayed Zestimate when other sellers who are represented by brokers who are party to the Zestimate Agreements are able to conceal their Zestimates.

30

101.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

102.     Plaintiff is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**WHEREFORE**, Plaintiff prays that final judgment be entered against each Defendant declaring, ordering, and adjudging that:

a.  The aforesaid agreements unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C § 1;

b.  Each Defendant be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the agreements in which it is alleged to have engaged, or any other agreement having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.  Each Defendant eliminate and cease acting under any agreements referenced herein and be prohibited from otherwise acting to restrain trade unreasonably;

d.  Plaintiff be awarded compensatory and punitive damages, trebled under 15 U.S.C. § 15.

e.  Plaintiff be awarded its costs of this action, reasonable attorney's fees, and such other relief as may be appropriate and as the Court may deem just and proper, pursuant to 15. U.S.C. §§ 15, 26.

31

## COUNT TWO: CONSPIRACY TO RESTRAIN TRADE
### (*N.J.S.A. 56:9-3*)

103.     Plaintiff incorporates by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

104.     In addition to the violations of the Sherman Act, as alleged above, the unlawful acts and conduct of the Defendants also violate the New Jersey Antitrust Act prohibition on conspiracies in restraint of trade within the State of New Jersey.

105.     As a result of the unlawful acts perpetuated by the Defendants, Plaintiff has suffered and will continue to suffer antitrust injury in an amount to be proven at trial, including hindering, impeding, delaying, obstructing, and/or preventing Plaintiffs from promptly selling the Hoover Property.

**WHEREFORE**, Plaintiff prays that final judgment be entered against each Defendant declaring, ordering, and adjudging that:

a.   The aforesaid agreements unreasonably restrain trade and are illegal under the New Jersey Antitrust Act, N.J.S.A. 56:9-3.

b.   Each Defendant be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the agreements in which it is alleged to have engaged, or any other agreement having a similar purpose or effect in violation of the New Jersey Antitrust Act.

c.   Each Defendant eliminate and cease acting under any agreements referenced herein and be prohibited from otherwise acting to restrain trade unreasonably;

d.   Plaintiff be awarded compensatory and punitive damages, trebled under the New Jersey Antitrust Act.

e.  Plaintiff be awarded its costs of this action, reasonable attorney's fees, and such

other relief as may be appropriate and as the Court may deem just and proper.

## COUNT THREE: NEW JERSEY CONSUMER FRAUD ACT
### (*N.J.S.A.* **56:8-1,** *et seq.*)

106.     Plaintiff incorporates by reference all of the allegations previously set forth in this

Complaint as if set forth at length herein.

107.     New Jersey's Consumer Fraud Act, 56:8-1, *et seq.* ("CFA"), declares that it is an

unlawful practice to act, use, or employ any unconscionable commercial practice, deception,

fraud, false pretense, false promise, or misrepresentation in connection with the sale or

advertisement of any merchandise or real estate.

108.     The CFA also declares that it is an unlawful practice to knowingly conceal,

suppress, or omit any material fact with the intent that others rely upon such concealment,

suppression, or omission in connection with the sale or advertisement of any merchandise or real

estate.

109.     The services that Zillow provides to both brokers, agents, homeowners, and those

who make use of its website are considered merchandise as defined by the CFA.

110.     Zillow's practice of: (i) compiling public information; (ii) developing an

inaccurate and/or misleading service (the Zestimate) with this publically available information;

(iii) displaying the inaccurate or misleading Zestimate on its platform; (iv) refusing to allow

consumers the ability to alter the presentation or display of the Zestimate on its platform; (v)

while at the same time allowing only those affiliated with certain brokers to alter the display of

and conceal the Zestimate from a listing is an unfair practice as defined by the CFA.

33

111.     In connection with these unfair practices, Zillow has made misrepresentations and/or knowing omissions regarding both its commitment to transparency as to the Zestimate and its even-handed application of the Zestimate to all property owners.

112.     As a direct and proximate result of Zillow's violation of the CFA, Plaintiffs have suffered an ascertainable loss resulting in substantial damages.

WHEREFORE, Plaintiff demands judgment in its favor and against the Zillow Defendants for compensatory damages, prejudgment interest, punitive damages, treble damages as mandated by *N.J.S.A.* 56:8-19, an award of attorney's fees as mandated by *N.J.S.A.* 56:8-19, and such other relief as this Court deems just and proper.

## COUNT FOUR: SLANDER OF TITLE/PRODUCT DISPARAGEMENT
### (New Jersey Common Law)

113.     Plaintiff incorporates by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

114.     Since March of 2015, Plaintiff EJ MGT LLC has been the owner in fee of the 142 Hoover.

115.     Since the date that EJ MGT LLC acquired the Hoover Property, the Zillow Defendants maliciously and without cause, published, among others, the following Zestimates of the Hoover Property: $3,703,597; $3,400,000; and $3,300,000.

116.     The above-described Zestimates were false, inaccurate, and/or misleading.

117.     When the Zillow Defendants published the Zestimates, they intended to harm the pecuniary interests of Plaintiff or recognized or should have recognized that the publishing of these Zestimates was likely to do so.

118.     Zillow acknowledges that the Zestimates it publishes are inaccurate, misleading, or false, or otherwise acts in reckless disregard for the truth or falsity of the Zestimates when it publishes them.

119.     Plaintiff has been marketing the Hoover Property since the publication of the false Zestimates.

120.     The false, inaccurate, or otherwise misleading Zestimates are capable of influencing third parties to not deal with Plaintiff and in fact have done so.

121.     Because of the Zillow Defendants' false Zestimates, Plaintiff  has been unable to sell the Hoover Property, been injured as a result, and incurred damages therefor.

122.     The Zillow Defendants' published the false Zestimates with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by such publication.

 **WHEREFORE,** Plaintiffs demand judgment in their favor and against the Defendants for compensatory damages, prejudgment interest, punitive damages as mandated by *N.J.S.A.* 2A:15-5.12, and such other relief as this Court deems just and proper.

## COUNT FIVE: INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (New Jersey Common Law)

123.     Plaintiff incorporates by reference all of the allegations previously set forth in this Complaint as if set forth at length herein.

124.     Plaintiff reasonably anticipated that it would be able to sell the Hoover Property in an arms-length transaction for a price at or reasonably near the appraised value.  This represents a substantial economic advantage.

125.     The acts, conduct and actions by the Zillow Defendants, either individually and/or in concert with Broker Defendants, represent an interference with Plaintiffs' prospective economic advantage.

126.     The actions and/or inactions of the Zillow Defendants were willful and intentional.

127.     The actions and inactions of the Zillow Defendants were accomplished with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by such publication.


**WHEREFORE,** Plaintiff demands judgment in their favor and against the Defendants for compensatory damages, prejudgment interest, punitive damages as mandated by *N.J.S.A.* 2A:15-5.12, and such other relief as this Court deems just and proper.


## JURY DEMAND

Plaintiff EJ MGT, LLC demands a jury trial on all issues so triable.

Respectfully submitted,

BEATTIE PADOVANO, LLC

By:   */s/ Edward R. Grossi*

Edward R. Grossi
Martin R. Kafafian
BEATTIE PADOVANO, LLC
50 Chestnut Ridge Road
Montvale, NJ 07645
Tel: 201-573-1810
Fax: 201-573-9369
Email: egrossi@beattielaw.com
Email: mrk@beattielaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATION UNDER LOCAL CIVIL RULE 11.2</u>

I hereby certify that the matter in controversy is not the subject of any other action pending

in this or any other court.

BEATTIE PADOVANO, LLC

By:   <u>*/s/ Edward R. Grossi*</u>

Edward R. Grossi
Martin R. Kafafian
BEATTIE PADOVANO, LLC
50 Chestnut Ridge Road
Montvale, NJ 07645
Tel: 201-573-1810
Fax: 201-573-9369
Email: egrossi@beattielaw.com
Email: mrk@beattielaw.com

*Attorneys for Plaintiff*

3020399_5\180029

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1</u>

I hereby certify that the above-captioned matter is not subject to compulsory arbitration because Plaintiff seeks damages in excess of $150,000 and injunctive relief.

BEATTIE PADOVANO, LLC

By:   <u>*/s/ Edward R. Grossi*</u>

Edward R. Grossi
Martin R. Kafafian
BEATTIE PADOVANO, LLC
50 Chestnut Ridge Road
Montvale, NJ 07645
Tel: 201-573-1810
Fax: 201-573-9369
Email: egrossi@beattielaw.com
Email: mrk@beattielaw.com

*Attorneys for Plaintiff*

3020399_5\180029