**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

EJ MGT LLC,

                    Plaintiff,

    v.

ZILLOW GROUP, INC., and ZILLOW, INC.,

                    Defendants.

Case No. 18-0584 (JMV) (JBC)

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO**
**THE MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**

---

**JAVERBAUM WURGAFT HICKS**
**KAHN WIKSTROM & SININS, P.C.**
Attorneys for Plaintiff EJ MGT LLC
Edward R. Grossi
505 Morris Ave.
Springfield, NJ  07081
(973) 379-4200
egrossi@lawjw.com

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

Reply Statement of Facts ........................................................................................... 4

Standard of Review .................................................................................................... 8

Reply Argument ........................................................................................................ 10

1.  The claim as pleaded by Plaintiff establishes a conspiracy in restraint of trade under Section 1 of the Sherman Act ............................................................................. 10

    A.  Plaintiff's allegations center on Defendant's agreements, not "wholly unilateral" conduct .............................................................................................................. 12

    B.  Plaintiff's allegations establish that the challenged agreements unreasonably restrain trade. ................................................................................................................. 15

    C.  Zillow offers no procompetitive justification for the Zestimate Agreements. ............... 21

    E.  Plaintiff pleads antitrust injury caused by Zillow's conduct. .......................................... 24

    F.  Plaintiff pleads injury-in-fact caused by Zillow's conduct. ........................................... 27

2.  Plaintiff's remaining causes of action state claims for relief. ............................................. 30

    A.  Plaintiff plausibly alleges that Zillow's misrepresentations and practices related to the Zestimate Agreements are unconscionable commercial practices that are illegal under New Jersey's Consumer Fraud Act. ................................................................................. 30

    B.  Plaintiff sufficiently pleads a cause of action for tortious interference, for which it can recover punitive damages even if no compensatory damages are awarded. ......................... 35

    C.  Plaintiff pleads a cause of action for product disparagement under New Jersey law. ... 38

Conclusion ................................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .......................................... 8

*Aspen Skiing Co. v. Aspen Hlnds. Skiing Corp.*, 472 U.S. 585 (1985) ................................. 13, 21

*Assocs. Home Equity Servs. v. Troup*, 343 *N.J. Super.* 254 (App. Div. 2001) ............................ 32

*Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977) ........................................................ 18

*Bonjorno v. Kaiser Alum. & Chem. Corp.*, 752 F.2d 802 (3d Cir. 1984) .................................... 27

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..................................................... 24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .......................................... 23

*Calif. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ................................................... 20, 23

*Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206 (3d Cir. 1983) ........................................ 28

*Di Cristofaro v. Laurel Grove Memorial Park,* 43 N.J. Super. 244 (App. Div. 1957) ............... 35

*DiGiovanni v. Pessel, supra*, 55 *N.J.* 188 (1970) ........................................................ 38

*Eastern States Lumber Ass'n v. United States*, 234 U.S. 600 (1914) ....................................... 10

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) ........................................... 14, 16, 20

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ....................................................... 18

*Geinosky v. City of Chi.*, 675 F.3d 743 (7th Cir. 2012) .................................................... 5

*Harper-Lawrence, Inc. v. United Merchants & Mfrs. Inc.*, 261 N.J. Super. 554 (App. Div. 1993)

............................................................................................................ 36

*Hawaii v. Std. Oil Co.*, 405 U.S. 251 (1972) ............................................................ 26

*In re Ins. Brokerage Antitrust Litig*, 618 F.3d 300 (3d Cir. 2010) ........................................ 19

*In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d. Cir. 2017) ............................................... 8

*In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198 (3d Cir. 2002) ...................... 30

*Jefferson Loan Co., Inc. v. Session*, 397 *N.J. Super.* 520 (App. Div. 2008) ............................... 32

*Juliano v. ITT Corp.*, 1991 U.S. Dist. LEXIS 1045 (D.N.J. Jan. 22, 1991) ................................ 39

*King Drug Co. v. Smithkline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) ................................ 17

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) ............................................ 13

*Kugler v. Romain*, 58 N.J. 522 (1971) .................................................................. 32

*Mayflower Transit, LLC v. Prince*, 314 *F. Supp. 2d* 362 (D.N.J. 2004) ....................................... 38

*McCue v. Deppert*, 21 *N.J. Super.* 591 (App. Div. 1952.) ..................................................... 37

*Myers v. Arcadio, Inc.*, 73 N.J. Super. 493 (App. Div. 1962) ...................................... 35

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37 (1984) ............................... 36

*Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679 (1978).......................... 10, 15, 21

*NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984)................................ 20

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998)....................................................... 20

*Pace Elecs., Inc. v. Canon Comp. Sys., Inc.*, 213 F.3d 118 (3d Cir. 2000) ..................... 27

*Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30 (1930) ......................... 10

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)......................................... 8

*Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739 (1989) .............. 35

*Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552 (1955) ............................ 35

*Realcomp II Ltd. v. FTC*, 635 F.3d 815 (6th Cir. 2011) .................................................. 17

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .............................................................. 27

*Ruivo v. Wells Fargo Bank*, 776 F.3d 87 (1st Cir. 2014)................................................. 8

*Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000.) .............................................................. 9

*Std. Oil Co. v. U.S.*, 337 U.S. 293 (1949) ..................................................................... 13

*Sustick v. Slatina,* 48 N.J. Super. 134 (App. Div. 1957)................................................. 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)................................. 9

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991) .................................. 24

*U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497 (3d Cir. 2017)................................. 30

*U.S. ex. Rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294 (3d Cir. 2016). 30

*United States v. Am. Linseed Oil Co.*, 262 U.S. 371 (1923) .......................................... 10

*United States v. Container Corp.*, 393 U.S. 333 (1969) ................................................. 15

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)............................... 15, 18

*Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398 (2004)............... 13

**Statutes**

15 U.S.C § 1 ................................................................................................................ 10

15 U.S.C. § 2 .............................................................................................................. 10

15 U.S.C. § 15 ............................................................................................................ 26

*N.J.S.A.* 56:8-2 .......................................................................................................... 29

**Other Authorities**

Benjamin Wittes and Wells C. Bennett, *Databuse and a Trustee Model of Consumer Protection in the Big Data Era*, GOVERNANCE STUDIES AT BROOKINGS, June 2014 ................................ 31

FTC Press Release, August 15, 2017 ......................................................................... 34

FTC Press Release, February 22, 2017 ..................................................................... 33

FTC Press Release, March 26, 2018 .......................................................................... 34

Max N. Helveston, *Consumer Protection in The Age of Big Data*, 93 WASH U. L. REV. 859, 862 (2016) ....................................................................................................................... 33

Restatement (Second) of Torts, § 623A. cmt. a. ......................................................... 39

Restatement (Second), § 633(2) ................................................................................... 40

Ross Todd, *Federal Law Enforcement Chiefs Outline White Collar Priorities Under Trump*, LAW.COM (Apr. 5, 2018) ............................................................................................. 14

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 7

Fed. R. Civ. P. 9(b) ...................................................................................................... 30

**Treatises**

PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ........................................................... 19, 23, 27

## **Preliminary Statement**

Zillow curiously argues that a Motion to Dismiss is warranted here, even though Plaintiff's Complaint has already caused the company to change its practices in significant and material ways with regard to its Zestimate. In support of its Motion, Zillow includes a number of new facts outside of the record to show how the Zestimate has allegedly been changed on Plaintiff's listing, and that this change has provided Plaintiff  a "benefit" and put it on "equal footing" with the co-conspirator brokers. These arguments are significant because they: (1) constitute a concession that Plaintiff has been harmed by the Zestimate Agreements; (2) acknowledge that the Zestimate Agreements confer a benefit on those who are a party to them; and (3) establish that Plaintiff has already achieved some measure of success through the filing of this litigation, as the changes did not take effect until after this lawsuit was filed.

But more significantly, the Zestimate has not been changed in the precise manner that counsel for Zillow has represented, it is apparent that the Zestimate Agreements remain in place, and the co-conspirator brokers continue to get the "benefit" of the "[un]equal footing" that is provided to them through the anticompetitive Zestimate Agreements. Thus, court intervention enforcing Section 1 of the Sherman Act is warranted to address the Zestimate Agreements, which constitute unreasonable restraints of trade.

1

Zillow's founders describe the Zestimate as a "critical piece of market information." Plaintiff has alleged, and Defendant does not dispute, that the Zestimate Agreements entered into by Defendant and its favored brokers allow certain market participants to suppress this "critical" price-related information from consumers' view. Plaintiff sets forth in detail how these restraints tend to reduce competition and the incentive to compete, interfere with the competitive process and normal price-setting mechanisms, stifle the flow of price-related information, cause increased prices and reduced output, and raise barriers to entry. *See* Complaint, at ¶¶ 83-85, 98. These plausible allegations meet Plaintiff's burden in opposing this Motion, and would do so even if Zillow offered a procompetitive justification for the Zestimate Agreements, which it has failed to do.

Rather than address the legality of the Zestimate Agreements, Zillow premises its Motion to Dismiss on the incorrect claim that it is engaged in solely unilateral conduct. Hoping to shift the narrative, Zillow ignores the undisputed existence of the Zestimate Agreements, and its reason for doing so is obvious: By miscasting its conduct as "wholly unilateral" in nature, Zillow is attempting to forestall the need to identify an offsetting procompetitive justification for the actual Zestimate Agreements. Zillow's refusal to address Plaintiff's actual allegations suggests that it cannot identify any such justifications, and that it has no viable argument to justify a Motion to Dismiss at this stage of the litigation.

Regarding Plaintiff's cause of action under the Consumer Fraud Act, Zillow again presents arguments to the Court based on facts that differ from those alleged by Plaintiff in the Complaint. Zillow continues to ignore the Zestimate Agreements, and references a separate federal action where certain consumer claims against it were dismissed in part. That case is entirely unhelpful to Zillow here, since it did not involve the Zestimate Agreements and did not raise the same allegations of unconscionable and deceptive practices that are asserted by Plaintiff in this action. Here, Plaintiff's CFA claim challenges Zillow's practice of compiling information about the public, manipulating this data in the form of the Zestimate, representing that the company is committed to transparency and even-handed application of the Zestimate, and then failing to honor these commitments by selectively entering into the Zestimate Agreements with only national brokerage chains, in effect turning the public's own data against it. This "databuse" meets the test of an unconscionable practice under the CFA, and Zillow concedes the point given its change in conduct following the filing of this Complaint. While Zillow has yet to give the public the benefit of the Zestimate Agreements (i.e. concealing reference to Zestimates below the listing price on the main listing page) it has now—only after this Complaint was filed—admitted to changing some of its practices regarding the display of Zestimates. This change is attributable to Plaintiff's Complaint and constitutes success on the merits.

The facts and arguments presented by Plaintiff establish that Zillow cannot meet its burden to dismiss any of the causes of action alleged in the Complaint. As discussed more fully below, Plaintiff has pleaded plausible allegations sufficient to survive Defendant's Motion to Dismiss, which should be denied in its entirety.

## Reply Statement of Facts

In response to Defendant's Statement of Facts, Plaintiff incorporates: (1) the detailed allegations in the Complaint in support of this Motion; (2) the accompanying Certification of Edward Grossi outlining the Complaint's allegations of Zillow's anticompetitive conduct and the anticompetitive effects of the Zestimate Agreements; and (3) the Certification of Elliott Malone, principal of Plaintiff EJ MGT, LLC, detailing the changes Zillow has made to its platform since this Complaint was filed. Below, Plaintiff highlights certain facts and explains how Zillow has already changed its conduct in response to this Complaint.

In a February 2016 interview with a technology news website, Zillow's founders, Richard Barton and Lloyd Frink, made a number of statements regarding the Zestimate that support many of Plaintiff's pending allegations.[1] The relevant

---

[1] Reference to these statements (whose existence cannot be reasonably disputed) does not convert this Motion into one for summary judgment to the extent that these statements are integral to Plaintiff's claim. *See* Defendant's Brief, n.4 at p. 4. Further, Plaintiffs are given broader leeway in including facts for illustrative purposes that they intend to prove in opposing a motion to dismiss. *See Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

excerpt from that interview is attached to the Certification of Edward Grossi as Exhibit A, and includes the following significant admissions from Zillow's founders regarding the Zestimate:

- The Zestimate is a "critical piece of marketplace information." (Grossi Certification, Exhibit A.)

- The Zestimate gives people "such a great sense for the value of the homes that are out there." (*Id.*)

- The Zestimate is described as "very provocative and personal and a little voyeuristic." (*Id.*)

- In formulating the Zestimate, Zillow purposely chose to provide it as a single valuation point rather than a range of values because "points are more provocative than ranges." (*Id.*)

- Zillow intended to formulate the Zestimate as a provocative and voyeuristic feature of its platform that it knew generated reactions and effects in the millions who initially viewed and interacted with it. (*Id.*)

Currently, Zillow represents that people use the Zestimate as a starting point for considering the price of a home and that the Zestimate is meant to provide data in a user-friendly format to promote transparent real-estate markets and allow people to make informed decisions. (Complaint, ¶ 57). Zillow also has acknowledged that the Zestimate causes problems for sellers of real estate and,

5

more particularly, brokers: "The Zestimate conversation: some real-estate agents avoid it, others conquer it. The conquering crowd would tell you they see the Zestimate as an opportunity [ ] to distinguish themselves as local experts around town. They're the Zestimate whisperers." (Complaint, at ¶ 59.) Within this context, Zillow admits that it has entered into agreements with certain brokers to conceal the display of Zestimates on those brokers' listings. (*Id.* at ¶¶ 62, 64.) Through the Zestimate Agreements, and before this Complaint was filed, Zillow would conceal the Zestimates for only certain Co-conspirator brokers' listings, while prominently displaying Plaintiff's and others' Zestimates as follows:



(Complaint, at ¶ 11.)

In its moving Brief, Zillow admits that it has changed the way it implements the Zestimate after this Complaint was filed. Zillow also alleges that through these

changes, Plaintiff has been both conferred a "benefit" and placed on "equal footing" with the Co-Conspirator brokers. (Brief in Support of Motion to Dismiss, at p. 5; *see also* Certification of Melissa Bogad in Support of the Motion to Dismiss.) This wording is important and constitutes an admission from Zillow that through the Zestimate Agreements, Plaintiff and all other consumers have been harmed and remain on "[un]equal footing."

Zillow's counsel also misstates the extent to which Plaintiff's listing has been changed. While Zillow's counsel represented to the Court that EJ MGT's listing now displays in the same manner as those of the Co-Conspirators' listings, this is not the case. (*See* Bogad Certification in Support of the Motion to Dismiss, Exhibit C.) To the contrary, as of April 23, 2018, Plaintiff' Zillow listing displays sometimes with a link to "View Zestimate" directly under the listing price, and at other times with the Zestimate published directly under the listing price. (*See* Malone Certification). As a result of this Complaint, Zillow appears to have implemented a new feature where the "View Zestimate" link appears in place of the amount of the Zestimate if the amount of the Zestimate is below a property's listed value. *Id.* Zillow also appears to now be manually altering the Zestimate on Plaintiff's listing to correct the defamatory and inaccurate Zestimate. (*Id.*) Before filing this Complaint, Plaintiff's Zestimate was approximately $3.7 million. Now, after the filing of this Complaint, Plaintiff's Zestimate is often in the $6 million to

$7 million range, after appearing to be routinely updated, perhaps manually. (*See* Malone Certification.) This and other changes that Zillow has implemented to its platform are directly attributable to this lawsuit.

## Standard of Review

Zillow's Motion to Dismiss under *Fed. R. Civ. P.* 12(b)(6) should be denied because Plaintiff's allegations suggest a plausible claim that the agreements between Zillow and the co-conspirator brokers are unreasonable restraints of trade. The Third Circuit recently elaborated on the plausibility standard in the context of an antitrust challenge to a reverse-payment agreement: "*Twombly* and *Iqbal* require only plausibility, a standard 'not akin to a probability requirement…those cases make clear that a claimant does not have to set out *in detail* the facts upon which he bases his claim." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 254 (3d. Cir. 2017). In such cases, a plaintiff will overcome a motion to dismiss where it plausibly alleges an illegal agreement lacked any justification. *Id.* at 257. Here, Plaintiff plausibly alleges that Defendant entered into multiple agreements with the Co-Conspirator Brokers; that those agreements caused multiple harms of the precise type that antitrust laws are meant to prevent; that those agreements produce no offsetting justifications (a fact Defendant does not dispute in its Brief); and that Plaintiff was injured as a result. Further, Zillow provides no such justifications in support of its Motion to Dismiss.

In considering this argument, the Court must indulge all reasonable inferences in Plaintiff's favor. *Ruivo v. Wells Fargo Bank*, 776 F.3d 87, 90 (1st Cir. 2014). The Court does not weigh its own assessment of whether the Plaintiff's ultimate success on the merits is probable or unlikely. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). It is to accept all factual allegations as true, construe the Complaint in the light most favorable to Plaintiff, and determine whether under any reasonable reading of the Complaint Plaintiff may be entitled to relief. *Id*. at 233. It is axiomatic that the existence of questions of fact warrant denial of a Motion to Dismiss. *See Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189-90 (2d Cir. 2012)  (reversing the District Court for making interpretive findings on a 12(b)(6) motion). If the factual allegations are plausible, the court cannot decide disputed fact issues; the court must assume that all plausible facts contained in the Complaint are true. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). While Zillow seeks to inject a plethora of facts outside the Complaint under either the completeness doctrine or through judicial notice, doing so only creates factual disputes and highlights the need for discovery.

Finally, if the Court is inclined to grant Zillow's Motion, Plaintiff should first be given the opportunity to amend the Complaint. *Phillips*, 515 F.3d at 228 (citing *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000.))

## Reply Argument

**1.      The claim as pleaded by Plaintiff establishes a conspiracy in restraint of trade under Section 1 of the Sherman Act.**

In its Motion to Dismiss, Zillow fails to analyze the actual agreements at issue in this case, the "Zestimate Agreements." It avoids the real issue by misclassifying the case as involving only unilateral conduct. Review of Plaintiff's allegations establishes that the Complaint establishes a cause of action under Section 1 of the Sherman Act because it plausibly claims that the agreements between Zillow and the other Co-Conspirator Brokers are unreasonable restraints of trade.

The Sherman Act is meant to "prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted." *Eastern States Lumber Ass'n v. United States*, 234 U.S. 600, 613 (1914). "In order to establish a violation of the Sherman Act it is not necessary to show that the challenged arrangement suppresses all competition … the interest of the public in the preservation of competition is the primary consideration. *Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 44 (1930).

Section 1 of the Sherman Act prohibits agreements among multiple market participants that constitute unreasonable "restraints of trade." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 691–92 (1978); 15 U.S.C § 1. Section 1

is distinct from § 2 of the Sherman Act, which targets purely unilateral conduct that constitutes "monopolization" or attempted monopolization. 15 U.S.C. § 2.

Here, there is no dispute as to the existence of the Zestimate Agreements. And, as alleged in the Complaint and described below, the Zestimate Agreements restrain trade by suppressing the flow of pricing information. Zillow has admittedly become the market leader in platform real-estate services, and is often the first stop for consumers searching for information about residential property. Zillow is pervasive and unavoidable. Homeowners have no choice as to whether their property will be listed on Zillow. The Zestimate system is a national listing of estimated prices that Zillow acknowledges is used by both buyers and sellers to make what is often the single most important investment a person or family will make: whether to buy or sell a home. Zillow itself represents that the Zestimate is a "critical piece of market information." Its real-world importance is evidenced by the very existence of the Zestimate Agreements themselves. The co-conspirator brokers would not have agreed to pay for the option to conceal Zestimates if that option did not offer a significant strategic advantage.[2] Zillow's arguments that the

---

[2] Zillow's opposition brief tacitly admits the strategic value and benefit enjoyed by parties to the Zestimate Agreements: it attempts to argue that Plaintiff got the same "benefit" and was placed on "equal footing" as parties to the Zestimate Agreements because of partial and temporary changes to Plaintiff's Zillow listing page that appear to have been made after Plaintiff filed the Complaint in this case. Zillow Brief at 5.

Zestimate Agreements do not have anticompetitive effects are thus belied by its own statements and conduct.

As Plaintiff alleges in detail, Zillow's agreements with its favored brokers cause anticompetitive effects. The burden now lies on Zillow to offer procompetitive justifications that offset these effects. As described below, Zillow fails to offer a single justification for its agreements. Its Motion to Dismiss should be denied accordingly.

## A.   Plaintiff's allegations center on Defendant's agreements, not "wholly unilateral" conduct.

Plaintiff's Complaint sets forth detailed allegations regarding the Zestimate Agreements, and Defendant does not dispute their existence in its Motion. Defendant's silence in this regard is unsurprising: its own agent admitted the existence of these agreements. Complaint at ¶ 3. The Zestimate Agreements between Defendant and (in its own words) "certain brokerages" are the cause of the anticompetitive effects alleged in this case. *Id.* As discussed further below, Plaintiff's Complaint alleges that it is these agreements that cause anticompetitive effects in the relevant markets.

Yet Defendant nonetheless attempts to portray the challenged conduct as being "wholly unilateral." Zillow Brief at 8. This argument is simply incorrect. Plaintiff has alleged much more than a wholly unilateral decision by one market participant. Plaintiff has alleged, and Defendant has not disputed, agreements

12

between multiple market participants, placing Defendant's conduct squarely under Sherman Act § 1. Further illustrating its error, Defendant goes on to rely on *Trinko*, a case involving an alleged violation of Sherman Act § 2. Zillow Brief at 8 (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004)). The plaintiff in *Trinko* did not allege any agreement on the part of the defendant and instead brought its claim under § 2. Here, Plaintiff has alleged that the defendant entered into multiple agreements, and that those agreements unreasonably restrained trade, in violation of § 1.

Defendant further compounds its error by selectively quoting precedent in order to argue that "The Supreme Court has repeatedly recognized that 'a case of a single trader refusing to deal with another, [or] even of a manufacturer and a dealer agreeing to an exclusive distributorship' does not violate the antitrust laws." Zillow Brief at 8 (partially quoting *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959)). This statement is flatly untrue. In fact, the Supreme Court has repeatedly held that both types of conduct may violate the Sherman Act. *See, e.g.*, *Aspen Skiing Co. v. Aspen Hlnds. Skiing Corp.*, 472 U.S. 585 (1985) (holding that a single firm's refusal to deal with another violated Sherman Act § 2); *Std. Oil Co. v. U.S.*, 337 U.S. 293 (1949) (upholding a lower court's decision that an exclusive agreement violated Sherman Act § 1 and Clayton Act § 3).

Defendant argues that even though the challenged agreements were entered into by multiple market participants, Defendant's subsequent dealings with Plaintiff must be treated as "wholly unilateral." If this were a valid argument, any cartel price-fixer could escape Sherman Act § 1 liability by making it. Naked agreements to fix prices are clear § 1 violations that invite criminal liability. Yet, applying Defendant's logic, a cartel member could simply urge the court to ignore its anticompetitive agreement to fix prices and hold that the subsequent conduct of charging consumers inflated prices was "wholly unilateral." If it were so easy to escape criminal liability, the DOJ Antitrust Division's criminal enforcers would be out of work, rather than trying record numbers of cases. *See, e.g.*, Ross Todd, *Federal Law Enforcement Chiefs Outline White Collar Priorities Under Trump*, LAW.COM (Apr. 5, 2018).

Plaintiff adequately alleges the existence of agreements entered into between Defendant and multiple other market participants. Defendant has neither rebutted nor even disputed that it engaged in this multilateral conduct. Defendant's argument that its conduct was "wholly unilateral" fails to reflect reality, a failure that its mischaracterization of precedent does not cure.

**B.      Plaintiff's allegations establish that the challenged agreements unreasonably restrain trade.**

An agreement in restraint of trade is "unreasonable" where it adversely affects competition and consumers, and the defendant cannot establish offsetting procompetitive efficiencies. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459-60 (1986). The Supreme Court has repeatedly condemned as "unreasonable" agreements that restrict the flow of competitively significant information, especially where that information involves prices. *See id; see also Prof'l Engineers,* 435 U.S. at 692.

Plaintiff adequately alleges that the Zestimate Agreements restrict the free flow of competitively significant information involving prices. *See, e.g.*, Complaint at ¶ 83. Plaintiff alleges, and Defendant does not dispute, that the Zestimate Agreements entered into by Defendant and its favored brokers allow certain market participants to suppress price-related information from consumers' view. Plaintiff sets forth in detail how these restraints tend to reduce competition and the incentive to compete, interfere with the competitive process and normal price-setting mechanisms, stifle the flow of price-related information, cause increased prices and reduced output, and raise barriers to entry. *See id.* at ¶¶ 83-85, 98.

In *Professional Engineers*, the Supreme Court held that an agreement not to submit price information to consumers of engineering services constituted an unreasonable restraint of trade in violation of Sherman Act § 1. As the Court

15

observed, "[p]rice is the 'central nervous system of the economy,' and an agreement that 'interfere[s] with the setting of price by free market forces' is illegal on its face." *Prof'l Engineers*, 435 U.S. at 692 (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226 n.59 (1940) and *United States v. Container Corp.*, 393 U.S. 333, 337 (1969)). As Plaintiff alleges, the Zestimate Agreements suppress price information from consumers' view, thereby "interfering with the setting of price by free market forces."

Similarly, in *Indiana Federation of Dentists*, the Supreme Court held that a dental association rule requiring members to suppress medical information from insurance companies was an unreasonable restraint of trade in violation of Sherman Act § 1. *Ind. Fed'n*, 476 U.S. at 466. The free flow of information is so vital to competition that a unanimous Court stated, "[E]ven if the desired information were in fact completely useless to the insurers and their patients in making an informed choice … the [Defendant] would still not be justified in deciding on behalf of its members' customers that they did not need the information . . . .'." *Id.* at 462.

As in *Professional Engineers* and *Indiana Federation of Dentists*, Plaintiff here adequately alleges that Defendant has entered into agreements with other market participants that have the effect of suppressing the free flow of competitively significant, price-related information. Plaintiff adequately alleges that this

16

interference with pricing—the "central nervous system of the economy"—harms competition and the competitive process, causes increased prices and decreased output, and increases barriers to entry, among other harms. As Defendant's own Brief explains, the Third Circuit recently stated that "reduction of output, increase in price, or deterioration in quality" are all anticompetitive effects. Zillow Brief at 9 (citing *King Drug Co. v. Smithkline Beecham Corp.*, 791 F.3d 388, 412 (3d Cir. 2015)). The Supreme Court recognized in *California Dental*, a case involving an agreement that restricted advertising by dentists, that such restraints are "in effect a form of output limitation, as they restrict the supply of information about individual dentists' services." *Calif. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999). The Zestimate Agreements similarly suppress the flow of marketplace information, an anticompetitive form of output limitation that violates § 1 absent a showing of offsetting procompetitive justifications. Worse yet, the Zestimate Agreements suppress price-related information, long identified as the single most critical type of information underlying market economies.

Federal courts at every level have repeatedly prohibited information-suppressing agreements under the Sherman Act. In *Realcomp II*, for example, the Sixth Circuit struck down a multiple-listing service ("MLS") system's website policy that limited the distribution of certain types of real-estate listings. Realcomp, an association of real-estate agents and brokers, had prohibited

17

information about exclusive agency and other nontraditional listings from being

distributed to public real-estate advertising websites through its MLS feeds.

*Realcomp II Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011). The court concluded

that that this policy had potential adverse effects on competition, had actual

adverse effects on competition, and was not subject to offsetting procompetitive

justifications. *Id.* at 828. En route to this holding, the court noted numerous

instances in which restrictions on dissemination of information have been found to

be unreasonable restraints of trade in violation of the Sherman Act:

> [S]imilar to excluding discount brokers from MLS altogether, the website policy limits exposure of discount listings. "[L]istings [are not … distributed as widely as possible" due to the website policy, "resulting in inefficient sales prices," which is the same kind of economic harm caused by MLS exclusions. *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1580 (11th Cir. 1991); *cf. Ind. Fed'n*, 476 U.S. at 461-62 (holding that proof of higher prices is not required in the context of "[a] concerted effort to withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified"); *Polygram Holding, Inc.* [*v. FTC*], 416 F.3d [29], 37 [D.C. Cir. 2005] ("[A]greements restraining autonomy in pricing and advertising impede the 'ordinary give and take of the marketplace.'"). In particular, the website policy— like exclusions found to be anticompetitive—"reduces the competition among brokers and could result in less competition for brokerage fees." *Thompson*, 934 F.2d at 1580; *see Cantor v. Multiple Listing Service of Dutchess Cnty, Inc.*, 568 F.Supp. 424, 430 (S.D.N.Y. 1983) (MLS rules "restrict[ed] [brokers'] ability to advertise their services" in order to prevent brokers from "obtainin[ing] any competitive advantage") *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 389 (1992) ("[P]rice advertising surely relates to price.").

*Realcomp II*, 635 F.3d at 831. Agreements regarding price have long been banned

as an actual or potential threat to the "central nervous system of the economy."

*Socony Vacuum*, 310 U.S. at 224 n. 59 (1940). Price advertising plays an

indispensable role in the allocation of resources in a free-enterprise system and

serves individual and societal interest in assuring informed and reliable decision-making. *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977) (citing *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 603-04 (1967)). By facilitating the selective suppression of price information, the Zestimate Agreements interfere with this role.

Moreover, the Zestimate Agreements tilt the competitive playing field toward Zillow's favored partners, another well-recognized type of anticompetitive effect. Zillow agrees to give certain brokers the option of choosing where and how the Zestimate is displayed on their listings, effectively giving its favored brokers the ability to conceal "critical" price information. As the Complaint sets forth in detail, multiple favored brokers have exercised this ability, suppressing the flow of price information in the marketplace and hindering consumers' ability to access critical pricing data. In *In re Ins. Brokerage Antitrust Litig.*, the Third Circuit held that the plaintiffs had adequately alleged that "strategic partnership" agreements between real-estate brokers and insurance companies that had the effect of "directing" sales volume to strategic partners were unreasonable restraints of trade. 618 F.3d 300, 312, 341-42 (3d Cir. 2010). Here, Plaintiff sets forth detailed allegations regarding a similar series of agreements that have the effect of tilting the playing field toward Defendant's favored partners. Complaint at ¶¶ 84, 85.

On their face, the Zestimate Agreements cause anticompetitive effects. A plaintiff in a Sherman Act § 1 case carries its initial burden where it alleges that the "challenged restraint is of a type *reasonably calculated* to have anticompetitive effects."  PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1504b (emphasis added). Here, Plaintiff has gone beyond its initial burden and alleged that the challenged restraint actually has anticompetitive effects. The Supreme Court has repeatedly recognized that such agreements "require[] some competitive justifications even in the absence of a detailed market analysis." *Ind. Fed'n*, 476 U.S. at 460 (quoting *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 110 (1984) (internal quotation marks omitted)).

## C.   Zillow offers no procompetitive justification for the Zestimate Agreements.

Agreements are evaluated under the Sherman Act using three different categories of analysis: *per se* illegality, "quick look", and full rule of reason.[3] Under the *per se* illegality category of analysis, anticompetitive restraints are conclusively presumed to be unreasonable. AREEDA & HOVENKAMP, *supra*, at ¶ 1500. Under either a quick look or more searching rule of reason, where the plaintiff alleges anticompetitive effects, the defendant must respond with offsetting procompetitive justifications for its agreements. *Ind. Fed'n*, 476 U.S. at 460.

Defendant does not offer a single procompetitive justification for the Zestimate Agreements. Instead, Defendant claims that it is free to engage in any sort of

---

[3] The Supreme Court has observed that "our categories of analysis of anticompetitive effect are less fixed than terms like 'per se,' 'quick look,' and 'rule of reason' tend to make them appear. We have recognized, for example, that 'there is often no bright line separating *per se* from Rule of Reason analysis . . . ." *Calif. Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999). Regardless of the standard nominally applied, however, the Court stated that "the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *Id.* at 779-80. Defendant avers that this case "must be assessed under the rule of reason" standard, since a "vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." Brief at 6 n.6 (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998)). As noted above, however, the challenged agreement does stifle price information and affects price levels. And regardless of which categorical label this Court ultimately decides to attach to Defendant's conduct in this case, Defendant dodges the "essential inquiry" set forth by the Supreme Court: whether or not its restraints "enhance[] competition." Defendant offers no argument that the restraints offer any procompetitive justifications, let alone justifications that are sizable enough to offset their anticompetitive effects.

"wholly unilateral" action that it wishes. Zillow Brief at 8. This claim is both factually incorrect and inapposite. Antitrust precedent supports no such limitless freedom; even wholly unilateral conduct can violate the antitrust laws. *See, e.g.*, *Aspen Skiing Co.*, 472 U.S. at 601 (citing multiple cases holding that wholly unilateral conduct constituted a violation of Sherman Act § 2). And Plaintiff alleges that it is the Zestimate Agreements, not wholly unilateral conduct by Defendant, which have the anticompetitive effects set forth above and in the Complaint.

Defendant also attempts to create, and then impose, a duty on Plaintiff to allege that the Zestimate Agreements contained "exclusivity provisions". Zillow Brief at 9. Antitrust law imposes no such duty. Myriad types of agreements have been held "unreasonable" despite their not containing exclusivity provisions. *See, e.g.*, *Ind. Fed'n*, 476 U.S. at 465-66 (holding that an information-suppressing agreement without an "exclusivity provision" was unreasonable); *Prof'l Engineers*, 435 U.S. at 694-95 (holding that an agreement to stifle the flow of pricing information without an "exclusivity provision" was unreasonable).

The Third Circuit's decision in *In re Ins. Brokerage Antitrust Litigation* is particularly instructive on this point. As the Third Circuit pointed out, plaintiffs in that case did "not allege that . . . each broker wanted its insurer-partners to deal exclusively with it." 618 F.3d at 332. Nonetheless, the Third Circuit held that the

plaintiffs alleged a viable § 1 claim. *Id.* at 340-42. Here, Plaintiff has adequately alleged that Defendant entered into a series of agreements with certain favored brokers, and that those agreements caused anticompetitive effects on multiple market participants, including other brokers and consumers. Complaint at ¶¶ 83-85, 98. In doing so, Plaintiff carried its initial burden, shifting the onus to Defendant to establish offsetting procompetitive justifications for the Zestimate Agreements. Defendant has failed to do so.

Defendant's silence makes it impossible to assess whether any such justifications exist, what those justifications might be, and whether any such justifications would be substantial enough to offset the considerable anticompetitive effects alleged. In short, Defendant's silence creates no grounds upon which it could prevail on a Motion to Dismiss in lieu of answering. The Zestimate Agreements can be viewed as a stark change from Defendant's standard business strategy, one that reduces the visibility of Zestimates, which are a "critical piece of market information" in Defendant's own words. As a result, the Zestimate Agreements reduce the usefulness of Defendant's market-dominating platform to consumers who use it to search for housing. Such conduct causes facially apparent anticompetitive effects, raising substantial questions as to its purpose and whether it is subject to any offsetting procompetitive justifications. Particularly given

Defendant's silence on this point, these are questions of the sort that can only be sufficiently resolved through discovery in this action.

The "essential inquiry" in any Sherman Act Section 1 case is whether the challenged agreements suppress or enhance competition. *Calif. Dental*, 526 U.S. at 779-80. According to Plaintiff's detailed allegations, the Zestimate Agreements suppress competition and cause a variety of anticompetitive effects. Defendant, on the other hand, offers no argument that its agreements somehow enhance competition. Accordingly, Defendant's Motion should be denied.

**E.     Plaintiff pleads antitrust injury caused by Zillow's conduct.**

A Sherman Act § 1 complaint should not be dismissed where it alleges plausible "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Put another way, allegations of an injury-in-fact that is an "antitrust injury" satisfy a plaintiff's initial burden. AREEDA & HOVENKAMP, *supra*, at ¶ 337a. Conduct that is "anticompetitive" causes both "antitrust injury" and "injury-in-fact", a difference that appears to have eluded Defendant in this case. An "antitrust injury" is an injury that stems from harm to "competition not competitors." *Brunswick Corp.*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). "To say that the plaintiff has not shown any injury to competition is to conclude that the antitrust laws have not been

violated at all." AREEDA & HOVENKAMP, *supra*, at ¶ 337a. At an "early stage of litigation," the "antitrust-injury doctrine depends less on the plaintiff's proof than on the logic of its complaint and its theory of injury." *Id.* at ¶ 337d. An "injury-in-fact" is an injury to a person's "business or property", a distinct concept explored further below.

As set forth in detail above and in Plaintiff's Complaint, the challenged agreements in this case cause precisely the types of injury that the antitrust laws were meant to prevent. Plaintiff's theory of injury is that the Zestimate Agreements stifle the flow of price information, tilt the competitive playing field toward favored brokers, and thereby cause the related harms described above. These are "injuries to competition", i.e., antitrust injuries.

Plaintiff alleges in detail how the Zestimate Agreements facilitate the suppression of information by Co-Conspirator Brokers. *See, e.g.*, Complaint at ¶¶ 65-68. As noted above, the U.S. Supreme Court has recognized this as a form of output reduction. Defendant's own Brief cites Third Circuit precedent recognizing output reductions as a cognizable antitrust injury. Zillow Brief at 11 (citing *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991)). Worse yet, the type of information being suppressed is pricing information, which forms the very core—the "central nervous system"—of the free-market competition the antitrust laws are meant to protect. Federal courts at every level have held that such

agreements unreasonably restrain trade in violation of Sherman Act Section 1. They would not have done so if such agreements do not cause antitrust injuries.

Plaintiff also alleges in detail how the Zestimate Agreements tilt the competitive playing field toward Defendant's favored brokers, allowing them the option of suppressing or displaying Zestimates—which the Defendant admits are "critical" information—at will. *See, e.g.*, Complaint at ¶¶ 66-69, 84-85. Non-favored brokers have no such option. Particularly at an early stage of pleadings, it is more than a reasonable inference that the Zestimate Agreements therefore give the Co-Conspirator Brokers a strategic advantage over their competitors. The Zestimate Agreements, in other words, do not promote competition on the merits. Instead, as the Complaint alleges, these agreements facilitate selective suppression of critical price-related information from consumers. *See, e.g.*, Complaint at ¶ 83d. Again, these are precisely the sorts of harms to competition and consumers that the antitrust laws are meant to prevent. These are antitrust injuries. *See Brunswick Corp.*, 429 U.S. at 489 (holding that "antitrust injury" is "injury of the type the antitrust laws were intended to prevent").[4]

---

[4] The facts alleged in the present case are not only distinguishable, but are the exact opposite of the facts at issue in *Brunswick Corp.*, in which the U.S. Supreme Court first announced the antitrust-injury requirement. In *Brunswick Corp.*, the plaintiff operated a bowling alley and was suing to block a more efficient rival (Brunswick) from acquiring failed bowling alleys in the area. The plaintiff's theory of harm was that it was unable to compete on the merits with Brunswick, and should be

Plaintiff has sufficiently alleged facts that indicate both a reasonable inference

of, and an actual, antitrust injury. This element is therefore met—and exceeded.

**F.     Plaintiff pleads injury-in-fact caused by Zillow's conduct.**

Plaintiff also adequately pleads injury-in-fact. Antitrust damages are available

for all injuries to a person's "business or property by reason of anything forbidden

in the antitrust laws." 15 U.S.C. § 15. "Business" refers to "commercial interests or

enterprises." *Hawaii v. Std. Oil Co.*, 405 U.S. 251, 264 (1972). "Property" is

similarly "defined broadly" and includes, among other things, money. AREEDA &

HOVENKAMP, *supra* ¶ 336 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)).

The U.S. Supreme Court has "made plain that the 'business or property'

requirement is virtually always satisfied provided there is some kind of injury that

can properly be characterized as economic." *Id.*

Plaintiff alleges with requisite specificity how the Zestimate Agreements,

which tilt the playing field toward the Co-Conspirator Brokers and away from

Plaintiff's broker, caused Plaintiff to suffer injury-in-fact in the form of lost profits.

---

insulated from such competition. The Supreme Court rejected this theory as
"inimical to the purposes of [antitrust] laws." *Brunswick Corp.*, 429 U.S. at 488.
    Here, unlike in *Brunswick Corp.*, Plaintiff is not urging the Court to insulate
either the Plaintiff or any other market participant from competition on the merits.
The inverse is true: Plaintiff urges this Court to *promote* competition on the merits
by removing the artificial restraints imposed by Zillow and its favored brokers. It is
those agreements, which "insulate the Co-conspirator Brokers from competition,"
Complaint at ¶ 17, that are inimical to the purposes of the antitrust laws.

The Third Circuit has repeatedly held that lost profits are a cognizable injury. *E.g.*, *Pace Elecs., Inc. v. Canon Comp. Sys., Inc.*, 213 F.3d 118, 119-20 (3d Cir. 2000) ("[Plaintiff] avers that . . . [it] has suffered significant financial detriment, consisting of, but not necessarily limited to, lost profits."); *Bonjorno v. Kaiser Alum. & Chem. Corp.*, 752 F.2d 802, 814 (3d Cir. 1984) ("[T]he district court did not err in allowing damages for both lost profits and actual losses . . . ."). In fact, lost profits are how damages are "typically measured" for "most antitrust violations not involving overcharges" and are the "most accurate measure of the damages actually sustained" in overcharge cases. AREEDA & HOVENKAMP, *supra*, at ¶¶ 395, 2371c3. In its Brief, Defendant appears to concede this element, albeit unwittingly, by noting that Plaintiff alleged with "specificity" that it "has been unable to sell 142 Hoover as a result of the Broker Agreement." Zillow Brief at 11. Thus, Plaintiff adequately alleges, and Defendant does not dispute, injury-in-fact.

It is axiomatic that "[e]very plaintiff in a civil case must show that its injuries were 'caused' by the defendant's illegal conduct." AREEDA & HOVENKAMP, *supra* at ¶ 338. The defendant's conduct need not be the sole cause of plaintiff's injuries; "to require proof that the illegal conduct was the *exclusive* cause of the plaintiff's injury would effectively deny private remedies, for multiple causes always affect everyone." *Id.* (emphasis in original). All that is required is some "causal nexus between defendant's wrongful conduct" and plaintiff's injury. *Danny Kresky*

*Enters. Corp. v. Magid*, 716 F.2d 206, 213 (3d Cir. 1983) (reversing district court's grant of motion for judgment n.o.v.).

Here, Plaintiff alleges in detail how the Zestimate Agreements allow the Co-Conspirator Brokers—but neither Plaintiff's broker nor Plaintiff—to selectively suppress Zestimates from consumers' view. Plaintiff's Complaint identifies multiple Zillow listings created by Co-Conspirators' agents displaying homes for sale in the New Jersey area with suppressed Zestimate information. Complaint at ¶ 63. As described above, selective suppression gives the Co-Conspirator Brokers a strategic advantage over other brokers, including Plaintiff's broker. Plaintiff's Complaint also describes and portrays how Zillow—having tilted the playing field to favor the Co-Conspirators via the Zestimate Agreements—caused Plaintiff's broker to be unable to match that strategic advantage. *Id.* at ¶¶ 95-96. As a direct result, as the Complaint alleges, the requisite causal nexus arose between Defendant's conduct and Plaintiff's lost profits. *Id.* at ¶ 94. Accordingly, Zillow presents no basis to dismiss the Complaint and its Motion should be denied.

**2.      Plaintiff's remaining causes of action state claims for relief.**

**A.      Plaintiff plausibly alleges that Zillow's misrepresentations and practices related to the Zestimate Agreements are unconscionable commercial practices that are illegal under New Jersey's Consumer Fraud Act.**

Zillow's arguments in support of its Motion to Dismiss the CFA claim ignore, again, the actual allegations in the Complaint, and rest on misguided semantics. Zillow inaptly frames the CFA claim as if it were premised on Zillow's publishing of inaccurate Zestimates alone, and that this claim is somehow similar to the recent consumer-fraud claims that were dismissed in litigation in another jurisdiction. This is not what Plaintiff contends is an unconscionable commercial practice. Rather, Plaintiff alleges that Zillow's practices regarding the Zestimate Agreements—taken together with the nature of the Zestimate and Zillow's misrepresentations that it is committed to transparency and even-handed application of the Zestimate—are unconscionable and violate New Jersey's Consumer Fraud Act. *N.J.S.A.* 56:8-2  (declaring that the act, use, or employment of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact in connection with the sale or advertisement of any merchandise is an unlawful practice). Zillow provides no argument to support

dismissal of Plaintiff's CFA claim based on the actual allegations in the Complaint.[5]

Here, the Complaint alleges facts that taken together plausibly assert an unconscionable scheme in which Zillow turns consumers' own information against them to the benefit of only a select group of national brokerages. Zillow "voyeuristically" collects enormous amounts of data regarding peoples' homes, compiles and manipulates this data to craft its own price list (the Zestimate), and represents that it is committed to transparency and fair application of its Zestimate to the millions of people who view the Zillow website. This representation is false given the Zestimate Agreements, which are undisclosed agreements that conceal the display of Zestimates and violate Zillow's own alleged commitment to transparency regarding the Zestimate. Through the Zestimate Agreements,  Zillow provides the Co-conspirator brokers with unfair competitive advantages that

---

[5] Zillow incompletely states the pleading standard for fraud. With allegations of fraud, a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b); *see also U.S. ex. Rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016)  ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story-that is, the who, what, when, where, and how of the events at issue.'" (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig*., 311 F.3d 198, 217 (3d Cir. 2002))). In doing so, a party must plead its claim with enough particularity to place defendants on notice of the precise misconduct which they are charged. *U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017).

directly harm the position of other consumers in the market, who are deprived from receiving the same benefit, and have no say in what Zillow does with their information about their own home. At least one scholar has coined a term for this conduct as "Databuse," which is:

> [t]he malicious, reckless, negligent, or unjustified handling, collection, or use of a person's data in a fashion adverse to that person's interests and in the absence of that person's knowing consent…We are not necessarily asking that our data remain private; we are asking, rather, that they not be used as a sword against us without good reason.

Benjamin Wittes and Wells C. Bennett, *Databuse and a Trustee Model of Consumer Protection in the Big Data Era*, GOVERNANCE STUDIES AT BROOKINGS, June 2014. The term Databuse aptly applies to Plaintiff's CFA claim, which asserts that the Zestimate Agreements are unfair and unconscionable practices.[6] The word 'unconscionable' must be interpreted liberally so as to effectuate the public purpose of the CFA. *Assocs. Home Equity Servs. v. Troup*, 343 *N.J. Super.* 254, 278 (App.

---

[6] While Zillow harps on Plaintiff's use of "unfair" as opposed to "unconscionable" in certain parts of the Complaint, it overlooks that the Complaint plainly alleges that Zillow's practices were unconscionable. Complaint, at ¶ 4. Regardless, even if Plaintiff alleged only that these practices were "unfair," that would still sustain a cause of action, as an unfair practice is one that is unconscionable. New Jersey's Consumer Fraud Act jury instructions make this point: "An 'unconscionable commercial practice' is an activity which is basically unfair or unjust which materially departs from standards of good faith, honesty in fact and fair dealing in the public marketplace." N.J. Civ. Jury Charge 4.43. Further, numerous decisions discuss that the CFA is meant to address "unfair" commercial practices. *See, e.g. Ciser v. Nestle Waters North Am., Inc.*, 596 Fed. Appx. 157, 160, *8, (3d Cir. 2015) (stating that the CFA provides consumers and small businesses a private right of action to challenge unfair commercial practices); *Kugler v. Romain*, 58 N.J. 522, 544 (1971).

Div. 2001). "Unconscionability" has been defined as "an amorphous concept obviously designed to establish a broad business ethic." *Jefferson Loan Co., Inc. v. Session*, 397 *N.J. Super.* 520, 534 (App. Div. 2008). "The standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing." *Kugler v. Romain*, 58 N.J. 522, 544 (1971).

By its plain terms, the CFA applies to the marketing of residential homes, and should be applied against Zillow here. Zillow admittedly implemented the Zestimate in a purposefully misleading manner, setting it as a specific data point rather than a range, and doing so because it was "provocative" and generated a response in the market. (Grossi Certification, Exhibit A.) Now, through the Zestimate Agreements, Zillow lets certain "chosen" brokers manipulate their Zestimate display in a manner not provided to the rest of the public. The clear intent of these agreements is to provide brokers with a competitive advantage over the public, whose data Zillow relies upon to be able to manufacture the Zestimate. This is not fair dealing; this abuse of data and turning of consumers' own information against them is the precise type of unconscionable practice that the CFA was enacted to address.

Moreover, the use of "Big Data" (such as that amassed by Zillow in compiling and publishing its Zestimates) in any industry has the potential to bring about harm to the public interest. Max N. Helveston, *Consumer Protection in The Age of Big*

*Data*, 93 WASH U. L. REV. 859, 862 (2016). The Big Data revolution, while undoubtedly providing gains to society, has not been costless to consumers, particularly regarding risks that data will be used without consent. *Id.* at 865, 872, 874. In similar contexts, the Federal Trade Commission Act has been routinely applied successfully against organizations that have made misrepresentations regarding the implementation of their privacy policy and the handling of data. *See, e.g.* FTC Press Release, February 22, 2017  (noting settlement of complaints alleging that makers of endpoint protection software falsely represented in their online privacy policies that they participated in privacy-certification programs); FTC Press Release, August 15, 2017  (noting settlement of Complaint against Uber Technologies Inc. based on claims that the company failed to live up to its claims that it closely monitored employee access to consumer and driver data and that it deployed reasonable measures to secure personal information it stored on a third-party cloud provider's servers); FTC Press Release, March 26, 2018  (noting that under the FTC Act the agency pursues companies that fail to honor their privacy practices and engages in unfair acts that cause substantial injury to consumers).

An internet platform's misrepresentations and misuse of private and public information, as here with Zillow, violates consumer-protection laws. Accordingly, Zillow's practices with regard to the Zestimate Agreements constitutes an unfair

and unconscionable practice under New Jersey's Consumer Fraud Act, and

Zillow's Motion to Dismiss should be denied.

**B.    Plaintiff sufficiently pleads a cause of action for tortious interference, for which it can recover punitive damages even if no compensatory damages are awarded.**

In arguing that Plaintiff's tortious interference claim should be dismissed,

Zillow ignores Plaintiff's allegation that prospective buyers have informed Plaintiff

that the Zestimate influenced them to not make an offer on Plaintiff's property.

Complaint, ¶¶ 94, 120. Also significant to this Count is the Zillow founders' own

statements explaining that they *intentionally* implemented the Zestimate in a less

accurate and more provocative manner—setting the Zestimate as a single point

rather than a more appropriate range of values—in order to provide greater

disruption to the real-estate market. (Grossi Certification, Exhibit A.)

Under New Jersey law, a claim for tortious interference with prospective

business advantage requires: (1) a prospective economic relationship from which

the plaintiff has a reasonable expectation of gain; (2) intentional and unjustifiable

interference with that expectation, and (3) a causative relationship between the

interference and the loss of the prospective gain. *See Printing Mart-Morristown v.

Sharp Electronics Corp.*, 116 N.J. 739, 563 (1989). A defendant claiming a

business-related excuse must justify not only its motive and purpose, but also the

means used. *Di Cristofaro v. Laurel Grove Memorial Park,* 43 N.J. Super. 244,

255 (App. Div. 1957)  (profit motive not a justification where cemetery owners assessed excessive fees as prerequisite to installing graves outside the grave markers, which forced the public to buy markers only from cemetery owners).

With tortious-interference claims, malice is not used in the literal sense, meaning ill-will toward the plaintiff. Rather, it means that "the harm was inflicted intentionally and without justification or excuse." *Printing Mart-Morristown, supra,* 116 N.J. at 751; *Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 N.J. 552, 563 (1955). "Maliciousness" is determined on an individualized basis. *Myers v. Arcadio, Inc.,* 73 N.J. Super. 493, 500 (App. Div. 1962). The standard must be flexible, and the court must view the defendant's actions in the context of each case. *Printing Mart, supra*, 116 N.J. at 757. Reduced to its essence, the relevant inquiry is whether the conduct was sanctioned by the "rules of the game." *Harper-Lawrence, Inc. v. United Merchants & Mfrs. Inc.,* 261 N.J. Super. 554, 568 (App. Div. 1993); *Sustick v. Slatina,* 48 N.J. Super. 134, 144 (App. Div. 1957).

Damages in a tortious interference claim can be proven many ways, and an award of even nominal damages at the time of trial is sufficient to allow a Plaintiff to seek recovery for punitive damages based an intentional tort that otherwise meets the standard for punitive damages, namely egregious conduct. *See Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 *N.J.* 37, 51 (1984)  (holding that punitive damages may be assessed in an action for an intentional tort involving egregious

conduct whether or not compensatory damages are awarded, at least where some injury, loss, or detriment has occurred).

Zillow cannot defend its actions by arguing that no valid or enforceable contract existed, as a claim for tortious interference is meant to protect one's prospective interests. As explained by the New Jersey Supreme Court: "In a civilized community which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property once it is acquired, but left unprotected by the law in his efforts to acquire it." *Printing Mart,* 116 *N.J.* at 750 (1989).

Actions that interfere with the right to conduct negotiations that might culminate in a contract have been held to constitute tortious interference with prospective business relations. *McCue v. Deppert*, 21 *N.J. Super.* 591, 597 (App. Div. 1952.) Here, Zillow's conduct with regard to the Zestimate, implementing it in an inaccurate and misrepresentative manner, was done in an admittedly intentional manner to cause as much provocation and interference with real-estate transactions as possible. They freely admit to recklessly providing specific values of property that they acknowledge are inaccurate and are more accurately represented as ranges, they purposefully decided on a single data point to represent the Zestimate in order to cause interference in the housing market, and they know the Zestimate causes such interference.

This alleged conduct is sufficiently reckless to entitle Plaintiff to an award of punitive damages at the time of trial and at this stage of the litigation, Plaintiff's claim for tortious interference and the associated claim for punitive damages should proceed. To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another. *DiGiovanni v. Pessel, supra*, 55 *N.J.* at 191. This may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Nappe*, 97 N.J. at 49. The allegations in the Complaint and Zillow's statements regarding the formulation and implementation of the Zestimate meet the requisite elements for a tortious-interference claim and punitive damages, which can be awarded at the time of trial even if only nominal damages are established. Accordingly, Zillow's Motion to Dismiss should be denied.

## C. Plaintiff pleads a cause of action for product disparagement under New Jersey law.

Product disparagement or trade libel require: (1) publication; (2) with malice; (3) of false allegations concerning one's property, product or business, and (4) special damages, i.e. pecuniary harm. *Mayflower Transit, LLC v. Prince*, 314 *F. Supp. 2d* 362, 378 (D.N.J. 2004).  Plaintiff meets all of these elements.

In order to establish "malice" in a product disparagement case, Plaintiff must show that Defendant's statements were false or that they were written with reckless disregard for the truth or falsity. *Id.* (citing *Juliano v. ITT Corp.,* 1991 U.S. Dist. LEXIS 1045, at *5 (D.N.J. Jan. 22, 1991). Plaintiff need not show that the defendant was substantially certain that the statement would influence a third person; it need only prove that the defendant reasonably recognized the likelihood that a third person would act on the falsehood in a manner that would result in pecuniary loss to the plaintiff. Restatement (Second) of Torts, § 623A. cmt. a.

Zillow's own statements and Plaintiff's allegations establish the reckless publication of false information about Plaintiff's property regarding the Zestimate. And Plaintiff pleads that it has suffered pecuniary harm through potential buyers informing it that the Zestimate influenced them to not make an offer on Plaintiff's property. Complaint, ¶¶ 94, 120. Plaintiff has also identified specific individuals who raised concern over the value of the Property given the low Zestimate. *See* Malone Certification, at ¶ 4. Zillow's founder's statements in the GeekWire interview, along with representations on its website acknowledging that the public relies on and uses the Zestimate such that successful brokers need to become "Zestimate whisperers," establishes that Zillow reasonably recognized that third parties would and in fact do rely on their alleged inaccurate and false statements regarding Plaintiff's Property when they were evaluating it.

As to pecuniary loss, a defendant found to have disparaged the business or product of another is responsible for: (a) the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by the disparagement; and (b) the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon the vendibility or value by disparagement. Restatement (Second), § 633(2). Here, Plaintiff has incurred both damages attributable to the delay in selling the property caused by the Zestimate, in addition to legal expenses. And these legal expenses have already resulted in some success. Zillow has begun to remedy its disparaging conduct through modifying Plaintiff's Zestimate. A cause of action that has already achieved at least some of Plaintiff's objectives should not be dismissed under *Fed. R. Civ. P.* 12(b)(6).

## <u>Conclusion</u>

As argued above, Zillow's Motion to Dismiss the Complaint Under Fed. R. Civ. P. 12(b)(6) should be denied. But if the Court is inclined to grant any part of Zillow's Motion, Plaintiff should first be permitted to amend the Complaint.

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM  & SININS, P.C.
505 Morris Ave, Springfield, NJ  07079
(973) 379-4200
*Attorneys for Plaintiff EJ MGT, LLC*

By: /s/   Edward Grossi
          egrossi@lawjw.com

Dated: May 2, 2018