Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| EJ MGT LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>ZILLOW GROUP, INC., and ZILLOW, INC.,<br><br>*Defendants.* | Civil Action No. 18-584 (JMV) (JBC)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case primarily concerns antitrust allegations against a market leader in online real estate information. Plaintiff EJ MGT LLC brings this action against Defendants Zillow Group, Inc., and Zillow, Inc. (collectively "Zillow") for conspiracy under the Sherman Act, 15 U.S.C. § 1 and other alleged violations. D.E. 1. The gist of Plaintiff's allegations is that Zillow illegally contracts with certain real estate brokers and agents to remove Zillow's estimated price, or "Zestimate," as to certain properties while not offering this option to other brokers, agents, and property owners, such as Plaintiff. *Id.* Plaintiff does not claim that the Zestimate is completely removed from the listings of the "co-conspirator brokers," but that the Zestimate is instead less prominently displayed.

Currently pending before this Court is Defendants' motion to dismiss Plaintiff's Complaint under Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted as well as Rule 9(b) for failure to plead a fraud claim with particularity. D.E. 11. The

Court reviewed all submissions[1] and considered this motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons that follow, Defendants' motion to dismiss is granted without prejudice.

## I. BACKGROUND[2]

Plaintiff EJ MGT is a New Jersey limited liability organization that is the owner of 142 Hoover Drive in Cresskill, New Jersey (the "Property"). Compl. ¶ 22. The Property is 1.5 acres of land and includes a single-family home measuring 18,000 square feet. *Id.* ¶ 89. Plaintiff spent significant time and resources restoring the Property since purchasing it in March 2015. *Id.* ¶¶ 90-91.

---

[1] Defendants' brief in support of their motion to dismiss will be referred to as "Def. Br.," D.E. 11-1; Plaintiff's opposition to this motion will be referred to as "Pl. Opp'n," D.E. 14; Defendants' reply to this opposition will be referred to as "Def. Reply," D.E. 17; Defendants' letter of supplemental authority will be referred to as "Def. Ltr," D.E. 18; Plaintiff's letter in response will be referred to as "Pl. Resp.," D.E. 19.

[2] The facts are derived from Plaintiff's Complaint. D.E. 1 ("Compl."). When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a district court may consider "exhibits attached to the complaint and matters of public record" as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

    Both parties submitted information that the Court did not consider. Defendants submitted the "current version of the Zillow webpage" for the relevant property. D.E. 11-3, Ex. B. Defendants, however, acknowledge that the webpage is different than that on which Plaintiff relied in its Complaint. Def. Br. at 4 n. 4, 5. It is true that a district court can consider documents integral to the complaint or relied upon in the complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Yet, Defendants have not provided any authority to support the Court considering information that has been changed or altered from the original pleading. Additionally, in its Opposition, Plaintiff attaches and extensively relies on an interview (not mentioned in the Complaint) with Zillow's co-founders, D.E. 15-1, Ex. A, as well as information regarding how Zillow pages have changed since the Complaint was filed, D.E. 16-1-6. The Court does not consider the foregoing information in resolving the current motion.

Zillow is a market leader in online real estate information. *Id.* ¶ 37. Among other things, it manages websites[3] that serve as the central database for all real estate listings (including those that are not for sale) in the United States. *Id.* ¶¶ 37, 41. Its flagship website, www.zillow.com, includes property facts (such as the number of bedrooms, number of bathrooms, and lot size), tax assessment information, prior transaction data, and listing information for over 110 million United States homes.[4] *Id.* ¶ 44.

For all listed properties, Zillow includes a Zestimate – Zillow's own estimate of the current market value of a home based on an algorithm that considers property facts (location, lot size, square footage, number of bedrooms/bathrooms, etc.), tax assessments, prior transactions (both of that property historically, and neighboring properties), and user data. *Id.* ¶¶ 45-46. Zillow represents that the Zestimate is the "starting point" for determining a home's value. *Id.* ¶ 47. Plaintiff alleges that "Zillow itself acknowledges" that this starting point is "false, inaccurate, or otherwise misleading." *Id.* ¶ 21. Yet, Plaintiff fails to mention that Zillow also publishes the error rate of its Zestimate publicly on its website (7.9% nationally as of January 5, 2015), and discloses the shortcomings of this estimate, namely, "homes in luxury markets" that have new renovations or "many custom features, which aren't' accounted for in the Zestimate model." Paul Moore, *The Zestimate Home Value Explained*, Premier Agent (January 5, 2015), https://www.zillow.com/agent-resources/blog/the-zestimate-explained/.[5]

---

[3] In 2014, Zillow purchased its top competitor, Trulia, and now operates both of the leading online real-estate databases. *Id.* ¶ 25.

[4] An address' Zillow page is also one of the first links to appear when someone uses a search engine, such as Google, for the address. *Id.* ¶ 38.

[5] Plaintiff cited to, and relied on, this article in its Complaint. Compl. ¶ 59. As discussed in note 2 above, the Court can therefore consider the article in reviewing this present motion.

In January 2017, Plaintiff listed the Property for sale. Compl. ¶ 92. Keller Williams served as the broker and listing agent; Zillow displayed the Property on its website. *Id.* ¶¶ 92, 93. Plaintiff alleges that Zillow's use and placement of its Zestimate on Zillow's website has prevented the Property from being sold. *Id.* ¶ 94. For example, on January 2, 2018, Plaintiff's Property was listed on Zillow for $7,788,000. *Id.* ¶ 63(f). Immediately under the sale price, the Zestimate reflected a price of $3,703,597. *Id.* Plaintiff alleges that potential buyers have advised Plaintiff that the difference between the listed sales price and the Zestimate informed their decision not to purchase the Property. *Id.* ¶ 94.

Plaintiff alleges an anticompetitive conspiracy in Zillow's contracting with specific brokers and agents, or "co-conspirator brokers," to omit Zestimates of particular properties from under the listing price. *Id.* ¶ 1. As noted, the Property's Zestimate was listed directly below its sales price, which is the typical placement of the Zestimate. *Id.* ¶¶ 9, 63(f). Plaintiff alleges that Defendant entered into "Zestimate Agreements," which allows certain brokers to relocate the Zestimates of their properties so that they do not appear directly under the listing prices. *Id.* ¶¶ 17, 61-62. The co-conspirator brokers include Sotheby's International Realty, Inc.; Coldwell Banker Real Estate LLC; Century 21 Real Estate LLC; The Corcoran Group ERA; and Weichert Realty. *Id.* ¶¶ 62-63. To be clear, Zillow does not completely remove the Zestimate for any listing. *Id.* ¶ 64. Even when it removes the Zestimate from under the listing price, Zillow still makes the Zestimate available under the "Zestimate details" tab on the property's Zillow page. *Id.*

Plaintiff contacted Zillow to remove the Property's Zestimate from directly underneath the Property's listing price, but Zillow refused. *Id.* A Zillow representative explained that "this feature is only available on our premiere agent program for real estate agents" and forwarded Plaintiff information on that program. *Id.* ¶ 65. The Zillow representative later clarified that "Zillow has

4

various partnerships with Agents, Brokerages, and Vendors that may display a listing page differently than others." *Id.* Plaintiff alleges that even premier agents cannot gain this preferential treatment unless they are members of the co-conspirator brokers. *Id.* ¶ 66. Plaintiff asserts that all others -- brokers, agents, and individual homeowners -- who are not associated with the co-conspirator brokers "are left no choice but to have the inaccurate and otherwise misleading Zestimates appear prominently" on their properties' Zillow pages, putting them at a distinct competitive disadvantage and harming overall competition in the local and national real estate markets. *Id.* ¶¶ 9, 79.

Plaintiff does not claim that the Zestimate provided for the Property did not reflect fair market value. *Id.* ¶¶ 11, 89-96. Similarly, Plaintiff does not allege that its listing price represented the fair market value of the Property. *Id.* Plaintiff also does not argue that it has not been able to sell the Property due to the positioning of the Zestimate below the asking price. Instead, Plaintiff claims certain, unnamed "[p]otential buyers" indicated that the difference between the Zestimate and the list price for the Property has "impacted and/or informed" the potential buyers' decision not to purchase the Property. *Id.* ¶ 94.

## II. PROCEDURAL HISTORY

Plaintiff filed its Complaint on January 1, 2018 alleging five causes of action: (I) conspiracy to restrain trade under Section 1 of the Sherman Act, 15 U.S.C. § 1; (II) conspiracy to restrain trade under the New Jersey Antitrust Act, N.J.S.A. 56:9-3; (III) fraud under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 *et seq.*; (IV) slander of title/product disparagement under New Jersey common law; and (V) interference with prospective economic advantage under New Jersey common law. Compl. ¶¶ 97-127. In lieu of answering, Defendants

filed this present motion to dismiss, D.E. 11, which Plaintiff opposed, D.E. 14, and Defendants replied, D.E. 17.

### III. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

Pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened pleading standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

## IV. ANALYSIS

Sherman Act[6]

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. To maintain a claim under Section 1, a plaintiff must allege (1) that defendant was a party to a "contract, combination . . . or conspiracy" (2) with an unlawful objective to put an "unreasonable restraint on competition." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998). The unlawful objective must relate to antitrust activities. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 331. In other words, an unlawful objective – such as fraud – separate from antitrust conduct may be otherwise actionable but not under the antitrust statutes. *Id.* Moreover, plaintiff must assert an antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 344 (3d Cir.) (explaining that plaintiffs "fail[ed] to aver an antitrust injury, such as a negative impact on consumers or to competition in general"),

---

[6] Plaintiff brings claims both under the Sherman Act, 15 U.S.C. § 1, Compl. ¶¶ 97-102, and New Jersey Antitrust Act, N.J.S.A. § 56:9-3, Compl. ¶¶ 103-105. "[T]he New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n. 11 (3d Cir. 2016) (quoting *State v. N.J. Trade Waste Ass'n*, 96 N.J. 8, 19 (1984)). Both parties concede this. Def. Br. at 12; *see* Pl. Opp'n at 30-40 (failing to individually evaluate its New Jersey Antitrust Act argument, instead implicitly relying on its Sherman Act argument). Therefore, the federal Sherman Act claim and its analogous New Jersey counterpart will be analyzed together.

*cert. denied sub nom. Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 139 S. Ct. 211, 202 L. Ed. 2d 126 (2018).

In determining whether conduct imposed an unreasonable restraint on trade, courts use one of three standards of review: "*per se*," "quick look," or "rule of reason." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315-18; *see also California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999) (analyzing the quick look standard); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986) (discussing the *per se* and rule of reason standard); *Monsanto*, 465 U.S. at 761 (same); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991) (applying rule of reason standard). Yet, these three categories are not necessarily distinct; there may be some overlap or blurring of boundary lines. *California Dental Ass'n*, 526 U.S. at 779.

"The usual standard applied to determine whether a challenged practice unreasonably restrains trade is the so-called rule of reason." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315 (internal quotations and alterations omitted). Under this standard, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *Id.* A plaintiff "bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *Id.* "Successful attempts to meet this burden typically include a demonstration of defendants' market power, as a judgment about market power is a means by which the effects of the challenged conduct on the market place can be assessed." *Id.* (internal quotations, citations, and alterations omitted). However, "proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." *Id.* (quoting *Indiana Fed'n of Dentists*, 476 U.S. at 460-61). Then, "[i]f the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-

9

competitive benefits." *Id.*; *see also Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001) (explaining that courts "balance the effect of the alleged anti-competitive activity against its competitive purposes within the relevant product and geographic markets").

The *per se* standard recognizes the fact that "some classes of restraints have redeeming competitive benefits so rarely that their condemnation does not require application of the full-fledged rule of reason." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 316. Courts apply a *per se* rule "when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Id.* (internal quotations omitted). "Paradigmatic examples are 'horizontal agreements among competitors to fix prices or to divide markets.'" *Id.* (quoting *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). In these limited circumstances, "plaintiffs are relieved of the obligation to define a market and prove market power"; the restraints are "conclusively presumed to unreasonably restrain competition" and considered "illegal *per se*." *Id.* at 316-17.

The "quick look," or abbreviated rule of reason, standard applies when restraints are "highly suspicious" but "sufficiently idiosyncratic that judicial experience with them is limited." *Id.* at 317. In other words, "[p]*er se* condemnation is inappropriate, but at the same time, the inherently suspect nature of the restraint obviates the sort of elaborate industry analysis required by the traditional rule-of-reason standard." *Id.* (internal quotations omitted); *see also California Dental Ass'n.*, 526 U.S. at 770 (explaining that the quick look standard is appropriate when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"). Under the quick look analysis, "competitive harm is presumed and the defendant must set forth some competitive justification for the restraints." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d

at 317. If a defendant cannot assert a plausible justification, the restraint will be deemed unlawful. *Id.* "If the defendant offers sound procompetitive justifications, however, the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis." *Id.*

Here, Plaintiff alleges that "vertical Zestimate Agreements are directly aimed at restraining horizontal competition in both the market for the sale of residential real estate and for the listing of residential real estate." Compl. ¶ 83. The Third Circuit has ruled that certain horizontal agreements can be subject to the *per se* or quick look analysis, but vertical agreements are subject to the full rule of reason review. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318. Thus, the Court conducts a full rule of reason review.[7]

Defendants argue that (1) not offering Plaintiff a Zestimate Agreement was not a concerted effort, but Defendants' own unilateral decision, (2) that Plaintiff has not sufficiently alleged anticompetitive effects, (3) that Plaintiff has not sufficiently alleged proximate cause, and (4) that Plaintiff has not sufficiently alleged an antitrust injury. Def. Br. at 6-12.

Plaintiff first disagrees that Zillow's decision was wholly unilateral and argues that it adequately alleged agreements to support this position. Pl. Opp'n at 12-15. Regarding this point, the parties appear to be talking past each other. Defendants appear to argue that they have taken unilateral action in determining whether to enter into the agreements with the alleged co-

---

[7] Plaintiff pleads that "[t]he alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws." Compl. ¶ 101. The Third Circuit has held that "[w]hile pleading exclusively *per se* violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy" because "[i]f the court determines that the restraint at issue is sufficiently different from the *per se* archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 317. Although Plaintiff does not expressly invoke the rule of reason standard, the Court finds that Plaintiff provides enough information in its pleadings and briefing to warrant an analysis of this correct standard. If the Court employed the *per se* standard, as Plaintiff alleges, then the motion to dismiss would be granted without further analysis because the standard is inappropriate in light the actual allegations here.

11

conspirator brokers. Def. Br. at 7-8. In other words, it appears that Defendants are claiming that there are no plausible allegations indicating that Defendants are prohibited – through the Zestimate Agreements – from entering into similar agreements with any other party, including Plaintiff. Plaintiff responds that the alleged Zestimate Agreements are sufficient proof of an agreement to satisfy Section 1. Pl. Opp'n at 12-13. For purposes of the current motion, the Court finds that Plaintiff has sufficiently alleged vertical agreements for Section 1 purposes.

Plaintiff then argues that unilateral conduct can also violate antitrust laws. Pl. Opp'n at 22. This is accurate, but it pertains to a Section 2 violation of the Sherman Act, 15 U.S.C. § 2, which addresses monopolies or attempted monopolies. In fact, in support of its argument, Plaintiff cites to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985), where the Supreme Court evaluated alleged violations of Section 2. Here, Plaintiff has asserted a violation of Section 1, so the unilateral conduct argument is inapposite. Unilateral or independent conduct is not subject to Section 1. *E.g., Monsanto*, 465 U.S. at 761 (explaining that "[i]ndependent action is not proscribed" by Section 1; a "contract, combination . . . or conspiracy" is required); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315 (same); *Tunis Bros.*, 952 F.2d at 722 (same).

Plaintiff also asserts that Defendants' argument falls short because they have not demonstrated the procompetitive aspects of the Zestimate Agreements. Pl. Opp'n at 15, 21. However, such an argument puts the cart before the horse, because under a rule of reason analysis, Plaintiffs must first demonstrate the harm (or potential harm) to competition before the Court (or Defendants) turn to the pro-competition attributes. In this regard, Plaintiff fails to analyze, much less cite any relevant authority regarding, the fact that the Zestimates are not completely omitted from the alleged co-conspirator brokers' listings. Instead, the Zestimates are still displayed but

not immediately under the listing price. Compl. ¶ 64. In that regard, this case concerns the prominence of certain information as opposed to the information's complete omission.

More fundamentally, Plaintiff's opposition takes a position inconsistent with the allegations in its Complaint. In its Complaint, Plaintiff argues that the Zestimates are unreliable and inaccurate. *E.g.*, Compl. ¶¶ 2, 8, 9, 13, 21. Plaintiff continues that the Zestimate Agreements create a competitive disadvantage because the misleading Zestimate is displayed directly under its listing price, while the same is not true for the Zillow listings of the co-conspirator brokers. *Id.* ¶¶ 9, 12, 61. The thrust of Plaintiff's entire case, as alleged in the Complaint, is that it wants the Zestimate removed from directly under its listing price.

Yet, in its opposition, Plaintiff makes a materially different argument. Plaintiff asserts that the Zestimates reflect "critical" price information and that consumers are harmed by Zillow and its alleged co-conspirators "suppress[ing] [this] price-related information from consumers' view." Pl. Opp'n at 15, 16, 19. Plaintiff alleges that Defendants facilitate the selective suppression of this "critical" price information and give co-conspirators the ability to conceal it as well. *Id.* at 19. Essentially, in its opposition, Plaintiff claims that Zestimates are critical pieces of information and that the Zestimate Agreements reduce the usefulness of Defendant's product for consumers because the Zestimates are not displayed in a prominent position. *Id.* at 23, 26. This is an entirely new theory of liability that was not pled in the Complaint.

As a result, the Court is unable to conduct the appropriate analysis in light of the motion to dismiss. The Court dismisses Plaintiff's Section 1 and analogous New Jersey Antitrust Act claims (Counts I and II) without prejudice.

New Jersey Consumer Fraud Act ("NJCFA")

Plaintiff next alleges that Defendants violated the NJFCA, N.J.S.A. § 56:8-1 *et seq.* Compl. ¶¶ 106-112. The NJCFA proscribes the use of any "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate[.]" N.J.S.A. § 56:8-2. To establish a prima facie claim under the NJCFA, a plaintiff must demonstrate: "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Valli v. Avis Budget Grp., Inc.*, No. 14-6072, 2017 WL 1956777, at *4 (D.N.J. May 10, 2017) (citing *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007)).

Defendants first argue that the NJCFA does not apply because their actions do not constitute a "sale or advertisement" as required by the statute. Def. Br. at 13-14. Defendants then argue that the Zestimate is an unactionable opinion and Plaintiff has not identified any misrepresentation made by Defendants. *Id.* at 14-15. Defendants add that Plaintiff has not met the heightened pleading requirements for fraud under Rule 9(b) and that Plaintiff fails to plead connection with ascertainable loss. *Id.* at 15-18. Plaintiff responds that it does not just rely on the Zestimates, but on the Zestimate Agreements for the Defendants' misrepresentations and calls Defendants' conduct a form of "Databuse" (essentially a reckless misuse of personal data). Pl. Opp'n at 30-34. Plaintiff argues that Defendants' use of "Big Data" is similar to the abuses outlined by the Federal Trade Commission in certain press releases. *Id.*

Notably, Plaintiff's opposition does not substantively address Defendants' argument. Plaintiff's misrepresentation claims in its Complaint appear to be grounded in Defendant

"developing," "displaying," and then selectively "conceal[ing]" the "inaccurate or misleading Zestimate on its platform." Compl. ¶ 110. Yet, Plaintiff fails to allege any misrepresentations as to the Zestimates. To the contrary, the Complaint recognizes that the Zestimate is Defendants' "own self-prepared *estimate* of current market value of a home based" based on property facts (location, lot size, square footage, number of bedrooms/bathrooms, etc.), tax assessments, prior transactions (both of that property historically, and neighboring properties), and user data. *Id.* ¶¶ 45-46 (emphasis added). Plaintiff acknowledges that the Zestimate is a *"starting point"* when determining a home's value. *Id.* ¶ 47 (emphasis added). The article on Defendants' website that Plaintiff relied on also publicly disclosed the historical error rate of the Zestimate, and explained that the Zestimate is unable to accurately account for renovations and other custom features. Paul Moore, *The Zestimate Home Value Explained*, Premier Agent (January 5, 2015), https://www.zillow.com/agent-resources/blog/the-zestimate-explained/ (relied upon by Plaintiff at Compl. ¶ 59). In light of these disclosures, Plaintiff fails to identify what was allegedly misrepresented.

In addition, Plaintiff fails to address Defendant's argument that the Zestimate is an unactionable opinion. "[S]ubjective opinions . . . cannot serve as the basis for a claim under the NJCFA." *Robinson v. Kia Motors Am., Inc.*, No. 13-006, 2015 WL 5334739, at *4 (D.N.J. Sept. 11, 2015) (citing *Rodio v. Smith*, 123 N.J. 345, 352 (1991)). As Defendants note, although not in the context of the NJCFA, the United States District Court for the Northern District of Illinois found that Zestimates "are not false or misleading representations of fact likely to confuse consumers because they represent opinions of value." *Patel v. Zillow, Inc.*, No. 17-4008, 2018 WL 2096453, at *6 (N.D. Ill. May 7, 2018), *aff'd*, No. 18-2130, 2019 WL 491797 (7th Cir. Feb. 8, 2019). The district court in that case, in an earlier opinion, explained that "Zillow clearly labels

Zestimates as estimates, and . . . Zillow goes above and beyond labeling and specifically makes clear that Zestimates are not appraisals, are just a starting point rather than a final accurate valuation, and are not always accurate." *Patel v. Zillow, Inc.*, No. 17-4008, 2017 WL 3620812, at *12 (N.D. Ill. Aug. 23, 2017), *aff'd*, No. 18-2130, 2019 WL 491797 (7th Cir. Feb. 8, 2019). Thus, the district court held that "given Zillow's representations regarding Zestimates, as pled in the complaint, Plaintiffs have failed to plausibly allege that Zestimates are anything more than nonactionable statements of opinion." *Id.* The Seventh Circuit affirmed and added that "plaintiffs are mistaken to think that the accuracy of an algorithmic appraisal system can be improved by changing or removing particular estimates." *Patel v. Zillow, Inc.*, No. 18-2130, 2019 WL 491797, at *2 (7th Cir. Feb. 8, 2019). The Court agrees; the Zestimates are non-actionable opinions under the NJCFA and the Zestimate Agreements have no impact on the veracity of these estimates. The Court dismisses Plaintiff's NJCFA claim (Count III) without prejudice.

Slander of Title/Product Disparagement

Plaintiff next alleges slander of title or product disparagement. Compl. ¶¶ 113-122. New Jersey does recognize an action for slander of title or product disparagement. The claims consist of four elements: "(1) publication (2) with malice (3) of false allegations concerning plaintiff's property or product (4) causing special damages, i.e., pecuniary harm." *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977) (citing *Rogers Carl Corp. v. Moran*, 103 N.J. Super. 163 (App. Div. 1968) and *Frega v. Northern New Jersey Mfg. Assn.*, 51 N.J. Super. 331 (App. Div. 1958)).

Defendants again argue that the Zestimate is a non-actionable opinion – not a "false allegation." Def. Br. at 18-19. Defendants then assert that they did not possess the requisite

malicious intent and that Plaintiff failed to plead special damages with particularity, as the conclusory assertion that Plaintiff has failed to sell the house is insufficient. *Id.* at 19-20.

At the outset, the Court notes that Plaintiff again fails to address Defendants' argument that the Zestimate is a non-actionable opinion rather than a false statement. Plaintiff also appears to be arguing that because Defendants *disclose* the limitations of their Zestimates, such as the error rate and the fact that it does not consider renovations in assessing value, the Zestimates are false. As best as the Court can comprehend, Plaintiff is arguing that when an entity discloses information and the limitations of that information, the acknowledgement of limitations equates to an admission of falsity. Not surprisingly, Plaintiff provides no support for this argument. Adequate disclosures, by their very nature, result in the disclosure of accurate (not false) information.

Plaintiff further asserts that Defendants did act with malice, as Plaintiff only must show that Defendants' statements were false or published with reckless disregard for truth or falsity. Pl. Opp'n at 38-39 (citing *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004)). Plaintiff however fails to point to any information supplied by Defendant that was false or made with reckless disregard as to the truth or falsity. Publishing the Zestimate, an estimate of the Property's fair market value with disclosed factors and limitations, does not satisfy the requisite standard of a reckless disregard for truth or falsity on the information that Plaintiff plead. Again, adequate disclosures prohibit a finding of falsity.

Finally, Plaintiff argues that it has incurred special damages. *Id.* at 40. "[A]n action for product disparagement requires special damage in all cases," meaning "the plaintiff must plead and prove special damages with particularity." *Intervet, Inc. v. Mileutis, Ltd.*, No. 15-1371, 2016 WL 740267, at *6 (D.N.J. Feb. 24, 2016) (quoting *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004)). This requires that Plaintiff "allege either the loss of particular

customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Id.* (quoting *Mayflower Transit*, 314 F. Supp. 2d at 378). A general diminution of business claim requires "facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales for a [period] subsequent to the publication." *Id.* (quoting *Mayflower Transit*, 314 F. Supp. 2d at 378).

Here, Plaintiff does not allege a general diminution of business. Instead, Plaintiff argues that it "identified specific individuals who raised concern over the value of the Property given the low Zestimate." Pl. Opp'n at 39. However, Plaintiff included this information in an exhibit attached to its brief in opposition, D.E. 16 at ¶ 4, not in its Complaint or attached to its Complaint; therefore, the Court cannot consider it. Plaintiff failed to adequately plead special damages. The Court dismisses Plaintiff's slander of title and product disparagement claim (Count IV) without prejudice.

Tortious Interference with Prospective Economic Advantage

Lastly, Plaintiff alleges that Defendants tortiously interfered with its prospective economic advantage. Compl. ¶¶ 123-127. Under New Jersey law, a plaintiff must plead the following elements to establish such a claim:

> (1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference.

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir.1992) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739 (N.J. 1989)).

Defendants argue that Plaintiff failed to identify a single customer or single contract that Zillow purportedly interfered with, and instead only generally alleged that it had "potential buyers" that were deterred given the Property's Zestimate. Def. Br. at 21-22. Defendants also allege that Plaintiff failed to show wrongful, intentional interference by Defendants, as the Zestimate simply relied on the same algorithmic estimation of value derived from publicly available data that it uses for all properties. *Id.* at 22-23. Finally, Defendants argue that Plaintiff failed to plausibly show how Defendants' wrongful conduct was *the* cause (as opposed to *a* cause) for the Plaintiff's inability to sell the Property to date. *Id.* at 23-24.

Plaintiff responds that it need not demonstrate the existence of a specific contract that Defendant interfered with, as interference with the right to conduct negotiations that could lead to a contract is sufficient. Pl. Opp'n at 36-37 (citing *McCue v. Deppert*, 21 N.J. Super. 591, 597 (App. Div. 1952)). Plaintiff's reliance on *McCue* is misplaced. In *McCue*, the plaintiff identified a specific buyer who was interested in the property, determined to buy it, and likely would have purchased it had it not been for the defendant's wrongful interference. 21 N.J. Super. at 597. Here, Plaintiff alleges no such buyer with any specificity in the Complaint. Instead, Plaintiff generally alleges that it "reasonably anticipated that it would be able to sell the Hoover Property in an arms-length transaction for a price at or reasonably near the appraised value." Compl. ¶ 124. This allegation is insufficient.

Plaintiff also argues that Defendants acted wrongfully and intentionally as evidenced by the statements of one of Zillow's founders. Pl. Opp'n at 35, 38. Yet, these statements were not included in, referred to, or attached as an exhibit to the Complaint; therefore, as explained above, the Court cannot consider them. The Court dismisses Plaintiff's tortious interference with prospective economic advantage claim (Count V) without prejudice.

## V. CONCLUSION

In sum, the Court grants Defendants' motion to dismiss (D.E. 11) without prejudice. Plaintiff has thirty (30) days to file an amended complaint, if it so chooses, consistent with this Opinion. If Plaintiff does not do so, this matter will be dismissed with prejudice. An appropriate Order accompanies this Opinion.

Date: February 28, 2019

                                              John Michael Vazquez, U.S.D.J.