**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

EJ MGT LLC,

*Plaintiff,*

v.

ZILLOW GROUP, INC., and ZILLOW, INC.,

*Defendants.*

Civil Action No. 18-584
(JMV)(JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

This case concerns antitrust allegations against a market leader in online real estate information. Plaintiff EJ MGT LLC brings this action against Defendants Zillow Group, Inc., and Zillow, Inc. (collectively, "Zillow" or "Defendants") for conspiracy to restrain trade under the Sherman Act, 15 U.S.C. § 1, and the New Jersey Antitrust Act, N.J.S.A. 56:9-3. D.E. 22. Plaintiff claims that Zillow illegally contracts with certain real estate brokers to alter those brokers' property listings' estimated prices, called "Zestimates," while not offering this option to other brokers, agents, and property owners, such as Plaintiff. Currently pending before the Court is Defendants' motion to dismiss Plaintiff's First Amended Complaint. D.E. 24. The Court reviewed all submissions[1] and considered this motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the following reasons, Defendants' motion to dismiss is **GRANTED**.

---

[1] Defendants' brief in support of their motion to dismiss will be referred to as "Defs.' Br." (D.E. 24); Plaintiff's opposition to this motion will be referred to as "Pl.'s Opp." (D.E. 29); and Defendants' reply to this opposition will be referred to as "Defs.' Reply" (D.E. 17).

I.  **BACKGROUND**[2]

The Court included a comprehensive factual background in its February 28, 2019 Opinion, D.E. 20, which the Court incorporates by reference here. By way of background, Plaintiff EJ MGT is a New Jersey limited liability organization that is the owner of 142 Hoover Drive in Cresskill, New Jersey (the "Property"). FAC ¶¶ 19, 37. Zillow is a market leader in online real estate information. *Id.* ¶ 2. Among other things, Zillow manages websites that serve as the central database for all real estate listings (including those that are not for sale) in the United States. *Id.* ¶¶ 51-59. For all listed properties, Zillow includes a Zestimate, which is Zillow's own estimate of the current market value of a home based on an algorithm that considers property facts (such as location, lot size, square footage, number of bedrooms/bathrooms), tax assessments, prior transactions (both of the particular property historically and neighboring properties), and user data. *Id.* ¶¶ 59-61. Zillow represents that the Zestimate is the "starting point" for determining a home's value. *Id.* ¶ 62.

In January 2017, Plaintiff listed the Property for sale. *Id.* ¶ 108. Keller Williams served as the broker and listing agent, and Zillow displayed the Property on its website. *Id.* ¶¶ 108-109. Plaintiff alleges that "the difference between the [Property's] Zestimate and the [Property's] listing price has impacted and/or informed [potential buyers'] decisions [] to [not] purchase [the Property]." *Id.* ¶ 110. For example, on January 2, 2018, the Property was listed on Zillow for $7,788,000. *Id.* ¶ 76(f). Immediately under the sale price, the Zestimate reflected a price of

---

[2] The facts are derived from Plaintiff's First Amended Complaint. D.E. 22 ("FAC"). When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a district court may consider "exhibits attached to the complaint and matters of public record" as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

2

$3,703,597. *Id.* Plaintiff alleges that certain unnamed "[p]otential buyers" have advised Plaintiff that the difference between the Property's listed price and its Zestimate "has impacted and/or informed" their decision to not purchase the Property. *Id.* ¶ 110.

Plaintiff further contends that after Plaintiff filed its original Complaint on January 15, 2018, Zillow altered the placement of the Property's Zestimate such that the Zestimate no longer "appear[ed] at the top of the property page" under the listing price; instead, a link with "View Zestimate" appeared (presumably providing the Zestimate if the link was selected).[3] *Id.* ¶¶ 115-116. Plaintiff also asserts that the Property's Zestimate on April 11, 2018 fluctuated from $3,649,959 to $6,988,251 to $3,751,865. *Id.* ¶ 119, Ex. D, E, F.[4] As of March 25, 2019, the Property's Zestimate was $5,415,788. *Id.* ¶ 121. Plaintiff claims that it has not been able to sell the Property to date, but acknowledges that the Property is currently being rented and is not presently listed for sale. *Id.* ¶ 122.

The essence of Plaintiff's claim is that Zillow participated in an anticompetitive conspiracy by contracting with certain brokers – "co-conspirator brokers" – to omit the Zestimates of particular properties from under their listing prices. *Id.* ¶¶ 1,3. As noted, at the time of the original Complaint, the Property's Zestimate was listed directly below its sales price. *Id.* ¶¶ 10, 76(f). Plaintiff alleges that Zillow entered into "Zestimate Agreements," which allowed certain brokers to relocate their properties' Zestimates so that they did not appear directly under their properties'

---

[3] In support of this allegation, Plaintiff cites to Exhibit B of its amended complaint, which Plaintiff describes as a "screenshot of [the Property] listing following the filing of the original Complaint." FAC ¶ 116. However, Exhibit B is not a listing of the Property, but rather a listing of a completely different property. *See* FAC, Ex. B.

[4] Plaintiff also acknowledges that these Zestimates include the following language: "The list price and Zestimate for [the Property] are very different, so we might be missing something." FAC, Ex. D, E, F.

3

listing prices. *Id.* ¶¶ 15-16. Importantly, however, Zillow does not completely remove the Zestimate for any listing. *Id.* ¶ 77. Even when it removes the Zestimate from under the listing price, Zillow still makes the Zestimate available under "Zestimate details" on the property's Zillow page. *Id.*

Plaintiff contacted Zillow to remove the Property's Zestimate from directly underneath the Property's listing price, but Zillow refused. *Id.* A Zillow representative explained that "this feature is only available on our premiere agent program for real estate agents" and forwarded Plaintiff information on that program. *Id.* ¶ 78. The Zillow representative later clarified that "Zillow has various partnerships with Agents, Brokerages, and Vendors that may display a listing page differently than others." *Id.* Plaintiff alleges that even premier agents cannot gain this preferential treatment unless they are affiliated with a co-conspirator broker who has a Zestimate Agreement. *Id.* ¶ 79. Plaintiff asserts that those brokers, agents, and individual homeowners who are not associated with the co-conspirator brokers "are left no choice but to have Zestimates appear prominently" on their properties' Zillow pages, putting them at a distinct competitive disadvantage and harming overall competition in the local and national real estate markets. *Id.* ¶¶ 16, 93.

## II. PROCEDURAL HISTORY

Plaintiff filed its original Complaint on January 1, 2018 alleging five causes of action: (1) conspiracy to restrain trade under Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) conspiracy to restrain trade under the New Jersey Antitrust Act, N.J.S.A. 56:9-3; (3) fraud under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 *et seq.*; (4) slander of title/product disparagement under New Jersey common law; and (5) interference with prospective economic advantage under New Jersey common law. D.E. 1, Compl. ¶¶ 97-127. Zillow filed a motion to dismiss Plaintiff's Complaint, D.E. 11, which the Court granted, D.E. 20. The Court also provided

4

Plaintiff an opportunity to file an amended complaint, which Plaintiff filed on March 29, 2019, alleging only two of its previous five counts: (1) conspiracy to restrain trade under Section 1 of the Sherman Act, and (2) conspiracy to restrain trade under the New Jersey Antitrust Act. D.E. 22. Zillow again moved to dismiss Plaintiff's Amended Complaint. D.E. 24. Plaintiff filed opposition, D.E. 29, to which Zillow replied. D.E. 30.

## III. STANDARD OF REVIEW

### A. Rule 12(b)(1)

In deciding a Rule 12(b)(1) motion for lack of subject-matter jurisdiction, a court must first determine whether the party presents a facial or factual attack because the distinction determines how the pleading is reviewed. A facial attack "contests the sufficiency of the complaint because of a defect on its face," whereas a factual attack "asserts that the factual underpinnings of the basis for jurisdiction fails to comport with the jurisdictional prerequisites." *Elbeco Inc. v. Nat'l Ret. Fund*, 128 F. Supp. 3d 849, 854 (E.D. Pa. 2015) (quoting *Moore v. Angie's List, Inc.*, 118 F. Supp. 3d 802, 806 (E.D. Pa. 2015)).

For a facial attack, "the Court must consider the allegations of the complaint as true," much like a Rule 12(b)(6) motion to dismiss. *Bd. of Trs. of Trucking Emps of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, No. 09-6447, 2010 WL 2521091, at *8 (D.N.J. June 11, 2010) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006)). However, for a factual attack, "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), *holding modified by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003). The burden is on the plaintiff to prove that the Court has jurisdiction. *Id.*

5

As for a district court's power to hear the case, "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). One key aspect of this case-or-controversy requirement is standing. *See id.* "The standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa.*, 757 F.3d at 360. To establish standing, a plaintiff must satisfy a three-part test, showing: "(1) an 'injury in fact,' *i.e.*, an actual or imminently threatened injury that is 'concrete and particularized' to the plaintiff; (2) causation, *i.e.*, traceability of the injury to the actions of the defendant; and (3) redressability of the injury by a favorable decision by the Court." *Nat'l Collegiate Athletic Ass'n v. Gov. of N.J.*, 730 F.3d 208, 218 (3d. Cir. 2013).

### B. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

6

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

## IV.   LAW AND ANALYSIS

### A. Article III Standing

A plaintiff seeking to establish Article III standing "must demonstrate '(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.'" *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 358-59 (3d Cir. 2015) (internal quotations omitted and punctuation modified)). The first element, an injury-in-fact, requires Plaintiff to show "'the invasion of a concrete and particularized legally protected interest' resulting in harm 'that is actual or imminent, not conjectural or hypothetical.'" *Finkelman*, 810 F.3d at 193 (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014)). The second element, causation, "requires the alleged injury to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Finkelman*, 810 F.3d at 193 (quoting *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137-38 (3d Cir. 2009)). The Third Circuit has explained that

7

Article III's causation requirement is "akin to 'but for' causation in tort and may be satisfied 'even where the conduct in question might not have a proximate cause of the harm.'" *Finkelman*, 810 F.3d at 193 (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013)). The third element, redressability, requires a plaintiff "to show that it is 'likely, as opposed to merely speculative,' that the alleged injury will be redressed by a favorable decision." *Finkelman*, 810 F.3d at 194 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

"When assessing standing on the basis of the facts alleged in a complaint," courts "apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim." *Id.* (citing *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). The Third Circuit has described this process as a three-step inquiry:

> First, we "tak[e] note of the elements a plaintiff must plead to state a claim" – here, the three elements of Article III standing. Second, we eliminate from consideration any allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "where there are well-pleaded factual allegations, [we] assume their veracity and then determine whether they plausibly" establish the prerequisites of standing. In conducting this analysis, we are mindful of the Supreme Court's teaching that all aspects of a complaint must rest on "well-pleaded factual allegations" and not "mere conclusory statements." Thus, to survive a motion to dismiss for lack of standing, a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." Speculative or conjectural assertions are not sufficient.

*Id.* (internal citations omitted).[5] With respect to causation, the Third Circuit has explained that

> [t]he causation element of standing requires a plaintiff to allege facts sufficient to show that his or her injury is "fairly traceable" to the

---

[5] In this context, the Third Circuit has acknowledged that "[s]ome of our sister circuits have questioned how well the 'plausibility' standard of *Iqbal* and *Twombly* maps onto standing doctrine." *Finkelman*, 810 F.3d at 194 n.55 (citing *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011), and *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 225 (2d Cir. 2008)). The Circuit continued, "[w]ithout wading too deeply into this particular thicket, we are content to say that, even when reviewing only the bare allegations of a complaint, *Iqbal* and *Twombly* teach that standing cannot rest on mere 'legal conclusions' or 'naked assertions.'" *Id.*

8

> alleged wrongdoing of the defendant. We have explained that traceability requires, at a minimum, that the defendant's purported misconduct was a "but for" cause of the plaintiff's injury.

*Id.* Here, Plaintiff's injury-in-fact is alleged as follows:

> Plaintiff has been injured and will continue to be injured in their business and property by taking longer to sell its property, receiving less for its property, and otherwise incurring lost profits in connection with the sale of [the Property] because of the presence of a prominently displayed Zestimate when other sellers who are represented by brokers who are part[ies] to the Zestimate Agreements are able to conceal their Zestimates.

FAC ¶126. In sum, Plaintiff's alleged injury is that, as a result of Defendants' Zestimate Agreements, Plaintiff has been unable to sell the Property, thus suffering damages. *See also* Pl.'s Opp. at 25 ("Plaintiff's injury, a lost opportunity of a sale as a result of a prominent Zestimate, was [] a foreseeable consequence of the Zestimate Agreements[.]"); *see also id.* at 29 ("Plaintiff alleges with requisite specificity how the Zestimate Agreements . . . caused Plaintiff to suffer [an] injury-in-fact in the form of lost profits."). Assuming that Plaintiff's alleged injury is sufficient to qualify as an injury-in-fact, Plaintiff nonetheless fails to establish the causation element of Article III standing.

"The causation element of standing requires a plaintiff to allege facts sufficient to show that his or her injury is 'fairly traceable' to the alleged wrongdoing of the defendant." *Finkelman*, 810 F.3d at 198. Moreover, such "traceability requires, *at a minimum*, that the defendant's purported misconduct was a 'but for' cause of the plaintiff's injury." *Id.* (emphasis added). In other words, Plaintiff must establish that "but for" Defendants' Zestimate Agreements with other brokers, Plaintiff would not have suffered lost profits from its inability to sell the Property. The facts alleged in the First Amended Complaint, however, fail to adequately establish this causal connection.

9

Here, Plaintiff's alleged causal connection between its injury and Defendants' conduct appears to concern the *value* of the Property's Zestimate rather than the *location* of the Property's Zestimate, and certainly does not appear to concern the *location* of Zestimates on the *co-conspirators'* property listings. For example, Plaintiff alleges that it "has been unable to sell [the Property] [because] [p]otential buyers have advised [Plaintiff's] agents and/or representatives that the *difference between the [Property's] Zestimate and the [Property's] listing price* has impacted and/or informed their decisions not to purchase [the Property]." FAC ¶ 110 (emphasis added). Plaintiff further alleges that "[t]hroughout January of 2017 and up to the filing of the original Complaint in this matter, the Zestimate for [the Property] remained around $3 million." *Id.* ¶ 111. Plaintiff contends that "[t]his Zestimate was *well below the appraised value*[6] of [the Property]," and that two potential buyers informed Plaintiff "that they viewed [the Property's] listing price] and also viewed the [Property's] Zestimate at this same time when [the Property] was around [three] million and were turned off from considering a potential purchase of the property *based on the discrepancy between the listing price and the Zestimate*." *Id.* ¶¶ 111-112 (emphasis added).

Plaintiff does not plausibly allege facts to support the reasonable inference that it has been unable to sell the Property because of the *lack of prominent* Zestimates on *other brokers'* listings, or even because of the *prominence* of the Zestimate on Plaintiff's *own* listing. Rather, it appears from Plaintiff's allegations that its injury is instead casually connected to the discrepancy in *value* between the Property's asking price and the Property's Zestimate. Presumably, if the Zestimate for the Property was *higher* than Plaintiff's asking price, then Plaintiff would not be claiming any

---

[6] Of note, Plaintiff's allegations as to the appraised value are conclusory. Plaintiff fails to indicate the appraised value, much less provide plausible factual support for how the appraisal was calculated.

10

injury – which leads to the conclusion that it is the amount of the Zestimate, rather than its location, which causes Plaintiff's alleged injury. At best, it is speculative and conjectural to infer that Plaintiff would not have encountered the same inability to sell the Property had Defendants not entered into Zestimate Agreements with other brokers. In sum, Plaintiff's allegations do not support the plausible inference that it's alleged injury (lost profits from its inability to sell the Property) is "fairly traceable" to Defendants' challenged conduct (providing certain brokers the option of altering the *positioning* of Zestimates on their *own* listings). Accordingly, the Court finds that Plaintiff has not satisfied the causation element of Article III standing, and therefore, Plaintiff does not have standing to bring its suit.

### B. Sherman Act, 15 U.S.C. § 1[7]

Even assuming, however, that Plaintiff did have Article III standing, Plaintiff still fails to establish that it has antitrust standing. Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. To maintain a claim under Section 1, a plaintiff must allege: (1) that the defendant was a party to a "contract, combination . . . or conspiracy" (2) with an unlawful objective to put an "unreasonable restraint on competition." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010); *Rossi v. Standard*

---

[7] Plaintiff brings claims under both the Sherman Act, 15 U.S.C. § 1, FAC ¶¶ 123-127, and New Jersey Antitrust Act, N.J.S.A. 56:9-3, *id.* ¶¶ 128-130. "[T]he New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016) (quoting *State v. N.J. Trade Waste Ass'n*, 96 N.J. 8, 19 (1984)). The parties agree on this point. Defs.' Br. at 15; *see generally* Pl.'s Opp. (failing to separately evaluate its New Jersey Antitrust Act argument, instead implicitly relying on its Sherman Act argument). Therefore, the federal Sherman Act claim and its analogous New Jersey counterpart will be analyzed together.

11

*Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998). The unlawful objective must relate to antitrust activities. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 331. In other words, an unlawful objective separate from antitrust conduct may be otherwise actionable, but not under the antitrust statutes. *Id.*

Moreover, "even [if] a plaintiff has established Article III standing, antitrust standing remains as a prerequisite to suit, focus[ing] on the nature of the plaintiff's alleged injury, [and] asking whether it is of the type that the antitrust statute was intended to forestall." *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 269 (3d Cir. 2016) (internal quotations omitted). Antitrust standing, unlike Article III standing, is a "prudential limitation" that does not affect the Court's subject matter jurisdiction over a matter, but rather "prevents a plaintiff from recovering under the antitrust laws."[8] *Ethypharm S.A. v. Abott Labs.*, 707 F.3d 223, 232 (3rd Cir. 2013); *see also Sullivan v. DB Invs. Inc.*, 667 F.3d 273, 307 (3d Cir. 2011) ("[L]ack of antitrust standing

---

[8] As recently explained by the Third Circuit in *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*,

> That Article III standing and antitrust standing both employ the term "standing" tends to confuse matters. The two concepts are distinct, with the former implicating a court's subject matter jurisdiction and the latter affecting only the plaintiff's ability to succeed on the merits. In *Ethypharm S.A. France v. Abbott Laboratories*, we explained that Article III standing is of constitutional and hence jurisdictional consequence, while antitrust standing is not[.] Constitutional standing is augmented by consideration of prudential limitations. For plaintiffs suing under federal antitrust laws, one of the prudential limitations is the requirement of antitrust standing. It does not affect the subject matter jurisdiction of the court, as Article III standing does, but prevents a plaintiff from recovering under the antitrust laws.

836 F.3d 261, 269-70 (3d Cir. 2016) (quoting *Ethypharm S.A.*, 707 F.3d at 232) (internal quotations, footnotes, and citations omitted)). Thus, for example, if a plaintiff showed an injury due to a tort, the plaintiff would have Article III standing but would lack antitrust standing.

12

affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court") (citing *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008))).

The Supreme Court in *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters* articulated several factors to consider when determining whether a plaintiff has antitrust standing. 459 U.S. 519, 535-38 (1983). Since then, the Third Circuit has "organized those factors . . . into the following multifactor test":

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Ethypharm S.A. France*, 707 F.3d at 232-33 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993)). In particular, "[p]rivate plaintiffs pursuing claims under § 1 of the Sherman Act have standing when they suffer an *antitrust injury* that is *causally related* to the defendants' allegedly illegal anti-competitive activity." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (emphasis added). In this context, antitrust standing "focuses on the nature of the plaintiff's alleged injury,' [and] ask[s] 'whether it is of the type that the antitrust statute was intended to forestall.'" *Hartig Drug Co. Inc.*, 836 F.3d at 269; *see also Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 344 (3d Cir. 2018) ("Appellants allege their own injury, namely, financial hardship. Tellingly, they fail to aver an antitrust injury, such as a negative impact on consumers or to competition in general, let alone any link between this impact and the harms Appellants have suffered."), *cert. denied sub nom. Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 139 S. Ct. 211 (2018).

13

Here, Defendants' alleged antitrust conduct is Defendants entering into Zestimate Agreements with certain brokers so that the Zestimates for those brokers' real estate listings appear less prominently on their listing pages. FAC ¶ 1. As previously noted, however, Plaintiff's alleged injury is of a personal nature – *i.e.*, lost profits from its inability to sell the Property. FAC ¶ 126; *see also* Pl.'s Opp. at 25 ("Plaintiff's injury, a lost opportunity of a sale as a result of a prominent Zestimate, was [] a foreseeable consequence of the Zestimate Agreements[.]"); *see also id.* at 29 ("Plaintiff alleges with requisite specificity how the Zestimate Agreements . . . caused Plaintiff to suffer injury-in-fact in the form of lost profits."). This personalized injury, however, is not "of the type that the antitrust statute was intended to forestall." *Hartig Drug Co. Inc.*, 836 F.3d at 269.

To the extent Plaintiff claims that the Zestimate Agreements give the co-conspirator brokers a "powerful advantage over their rivals," FAC ¶ 21, or otherwise "tilt the playing field in [their] favor," *id.* ¶ 34, such claims are, at best, speculative and conclusory. Plaintiff's allegations rely on at least two assumptions that are not supported by an plausible facts: first, that the Zestimates are always less than the asking price, and second, that the co-conspirator brokers have been able to sell comparable properties (to the Property) at a similar price (to Plaintiff's asking amount) in a shorter amount of time. Plaintiff fails to plausibly allege facts from which the Court can reasonably infer the same. Additionally, while Plaintiff vaguely alleges various other injuries to consumers and competition in general that purportedly result from the Zestimate Agreements, *see* FAC ¶¶ 30, 34, 83, 85, 99, 124, Plaintiff fails to allege that it suffered from any of these injuries. Simply put, Plaintiff fails to demonstrate a causal link between the purported antitrust effect of the Zestimate Agreements and the harm Plaintiff has suffered. *Philadelphia Taxi Ass'n, Inc.*, 886 F.3d at 344; *see also Eichorn*, 248 F.3d at 140 ("Private plaintiffs pursuing claims under § 1 of the

Sherman Act have standing when *they suffer* an antitrust injury that is *causally related* to the defendants' allegedly illegal anti-competitive activity.").

For example, Plaintiff alleges that "[t]he Zestimate Agreements . . . have the purpose and effect of stifling and distorting the flow of price related information, anticompetitively tilting the playing field in favor of the co-conspirator Brokers, and creating and heightening barriers to entry in the market for residential real estate listing services." *Id.* ¶ 34. As a result of these effects, Plaintiff alleges that Zillow users are injured because they, *inter alia*: (1) "are forced either to make decisions based on selectively distorted information or to expend additional time and effort to scour each listing for potentially concealed information"; (2) are forced to pay "increased [costs] in the form of advertising fees, brokers' commissions, or other costs incurred solely to alter or conceal the display of Zestimates"; and (3) face barriers to entry and expansion in the listing and sale of residential real estate. *Id.* ¶¶ 30, 34, 83, 85, 99, 124. Notably, Plaintiff fails to provide adequate factual support for such allegations.

Even taking these allegations as true, however, Plaintiff's alleged injury does not reflect any of the antitrust injuries Plaintiff vaguely argues the Zestimate Agreements cause. Plaintiff does not make allegations that it was forced to make a decision based on distorted information; or that it was forced to expend extra time looking for a Zestimate; or that it had to (or imminently was going to) pay increased fees or other costs as a result of the Zestimate Agreements; or that it faced barriers of entry into the real-estate listing market. Instead, Plaintiff's alleged injury arises from its inability to sell the Property, purportedly as a result of the Zestimate Agreements. FAC ¶ 126. And, as noted above, it is not actually the placement of the Zestimates of which Plaintiff complains, but the amount of the Zestimate vis-à-vis the Property. Accordingly, the Court finds

that Plaintiff lacks antitrust standing and therefore dismisses Plaintiff's claims on this alternative ground.

## V. CONCLUSION

In sum, the Court **GRANTS** Defendants' motion to dismiss, D.E. 24, without prejudice. Plaintiff has thirty (30) days to file a Second Amended Complaint, if it so chooses, consistent with this Opinion. If Plaintiff fails to do so, this matter will be dismissed with prejudice. An appropriate Order accompanies this Opinion.

Date: March 3rd, 2020

_____
John Michael Vazquez, U.S.D.J.