**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EJ MGT LLC,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>ZILLOW GROUP, INC., and ZILLOW, INC.,<br><br>　　　　　*Defendants*. | Civil Action No. 18-584<br><br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

　　This case concerns antitrust allegations against a market leader in online real estate information.  Plaintiff EJ MGT LLC brings this action against Defendants Zillow Group, Inc., and Zillow, Inc. (collectively, "Zillow" or "Defendants") for conspiracy to restrain trade under the Sherman Act, 15 U.S.C. § 1, and the New Jersey Antitrust Act, N.J.S.A. 56:9-3.  Plaintiff claims that Zillow illegally contracts with certain real estate brokers to alter the location of those brokers' property listings' estimated prices, called "Zestimates," on Zillow's webpages while not offering this option to other brokers, agents, and property owners, such as Plaintiff.  Currently pending before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint ("SAC").  D.E. 42.  The Court reviewed all submissions[1] and considered this motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).  For the following reasons, Defendants' motion to dismiss is granted.

---

[1] Defendants' brief in support of their motion to dismiss will be referred to as "Br.," D.E. 42; Plaintiff's opposition to this motion will be referred to as "Opp.," D.E. 49; and Defendants' reply to this opposition will be referred to as "Reply," D.E. 50.

I.      **BACKGROUND**[2]

The Court included comprehensive factual backgrounds in its February 28, 2019 and March 3, 2020 Opinions, D.E. 20 ("MTD Op."), D.E. 33 ("2d MTD Op."), which are incorporated by reference here.  Plaintiff EJ MGT is a New Jersey limited liability company that owns 142 Hoover Drive in Cresskill, New Jersey (the "Property").  SAC ¶ 23.  Zillow is a market leader in online real estate information.  *Id.* ¶¶ 1, 48.  Zillow manages websites that serve as the central database for all real estate listings (including those that are not for sale) in the United States.  *Id.* ¶¶ 48-54.  The "Zillow Website" is Zillow's "flagship offering and the market leader in the online-real-estate-database" industry.  *Id.* ¶ 48.

For all listed properties, Zillow includes a "Zestimate," which is Zillow's own estimate of the current market value of a home based on an algorithm that considers property facts (such as location, lot size, square footage, number of bedrooms/bathrooms), tax assessments, prior transactions (historical sales prices of the particular property and recent sales of comparable neighboring properties), and user data.  *Id.* ¶ 56.  "According to Zillow, the Zestimate home valuation is Zillow's estimated market value of the property."  *Id.* ¶ 57.  Zillow represents that the Zestimate is the "starting point" for determining a home's value.  *Id.* ¶ 58.

In January 2017, Plaintiff listed the Property for sale.  *Id.* ¶ 151.  Keller Williams served as the broker and listing agent, and Zillow displayed the Property on its website.  *Id.* ¶ 152.  Plaintiff alleges that "[t]hroughout January of 2017 and up to the filing of the original Complaint

---

[2] The facts are derived from Plaintiff's Second Amended Complaint.  D.E. 40 ("SAC").  When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

in this matter, the Zestimate for [the Property] . . . was well below the appraised[3] value of" the Property.  *Id*. ¶ 154.  Plaintiff further claims that "[t]wo potential buyers have explained[4] . . . that they viewed 142 Hoover Drive in 2017 and were confronted with the prominent Zestimate at this same time . . . and were turned off from considering a potential purchase of the property."  *Id*. ¶ 155.  Plaintiff claims that the Zestimate for the Property "began to fluctuate shortly after the original complaint was filed."  *Id*. ¶ 161.  Plaintiff further contends that after Plaintiff filed its original Complaint on January 15, 2018, Zillow altered the placement of the Property's Zestimate such that the Zestimate no longer "appear[ed] at the top of the property page" under the listing price; instead, a link with "View Zestimate" appeared (presumably providing the Zestimate if the link was selected).  *Id*. ¶ 159.  Plaintiff has been unable to sell the Property in the 36 months that it has been listed on the market.  *Id*. ¶ 166.[5]

Plaintiff contacted Zillow to remove the Property's Zestimate from directly underneath the Property's listing price, but Zillow refused.  *Id.* ¶ 75.  A Zillow representative explained that "this feature is only available on our premiere agent program for real estate agents" and forwarded Plaintiff information on that program.  *Id*.  The Zillow representative later clarified that "Zillow

---

[3] As the Court noted in its prior Opinion, Plaintiff only refers to the "appraised value" in a conclusory manner.  2d MTD Op. at 10 n. 6.  Plaintiff does the same in the SAC.

[4] The SAC does not indicate when the two potential buyers conveyed the information to Plaintiff or how it was conveyed to Plaintiff.  The SAC also fails to indicate whether the two potential buyers ultimately purchased a comparable property in the area, much less whether they bought a property that was listed by one of the Co-conspirator Brokers.

[5] Given that Plaintiff's theory of the case is that they were harmed by the prominent location of the Zestimate next to the Property's asking price, Plaintiff inexplicably fails to allege how this seemingly critical change – to the link with View Zestimate – caused them to be unable to sell the Property over such a long period, that is, from January 2018 to the present.  Plaintiff also fails to explain how its antitrust allegations are not limited to January 2017 (when Plaintiff first put the Property on the market) to January 2018 (when the View Zestimate link began).

has various partnerships with Agents, Brokerages, and Vendors that may display a listing page differently than others." *Id.* Plaintiff alleges that even premier agents cannot gain this preferential treatment unless they are affiliated with brokers who have contracted (referred to in the SAC as "Zestimate Agreements") with Zillow to move the Zestimate on the Zillow Website (referred to in the SAC as "Zestimate Suppression"). *Id.* ¶ 79.

Plaintiff alleges "[o]n information and belief" that "Zillow offers Zestimate Suppression to only one brokerage firm within a geographic market." *Id*. ¶ 116.  The Property, according to Plaintiff, is located in the "Triboro Market," which Plaintiff defines as the "high-end Cresskill-Alpine-Demarest Triboro market[.]" *Id*. ¶ 9.  In the Triboro Market, "Realogy is the sole brokerage firm to which Zillow offers Zestimate Suppression." *Id*. ¶ 118.  Plaintiff further alleges that "[t]here is either an express or *de facto* agreement between Zillow and Realogy that Realogy would be the only firm to have availability to Zestimate Suppression during the course of the agreement." *Id*. ¶ 119.  Plaintiff asserts that those brokers, agents, and individual homeowners who are not associated with the "Co-Conspirator Brokers" "are left no choice but to have Zestimates appear prominently"[6] on their properties' Zillow pages, putting them at a distinct competitive disadvantage and harming overall competition in the local and national real estate markets. *Id.* ¶¶ 16, 93.

Plaintiff claims that Zillow participated in an anticompetitive conspiracy by contracting with certain brokers – "Co-Conspirator Brokers" – regarding the display of the Zestimate on Zillow's website for properties listed through the Co-Conspirator Brokers. *Id*. ¶ 84.  Specifically,

---

[6] This allegation as to the prominence of the Zestimate is written in the present tense.  However, as noted, Plaintiff also claims that after it filed its initial Complaint, Zillow altered the placement of the Property's Zestimate such that the Zestimate no longer "appear[ed] at the top of the property page" under the listing price; instead, a link with "View Zestimate" appeared. *Id*. ¶ 159.  The SAC does not clarify this apparent discrepancy.

Plaintiff alleges that Zillow entered into the Zestimate Agreements which allowed the Co-Conspirator Brokers to use Zestimate Suppression to relocate their properties' Zestimates so that they did not appear directly under their properties' listing prices. *Id.* ¶¶ 3, 4.[7]  Zillow, however, does not completely remove the Zestimate for any listing. *Id.* ¶ 74.  Even when it removes the Zestimate from under the listing price, Zillow still makes the Zestimate available under "Zestimate details" on the property's Zillow page. *Id.*  However, without Zestimate Suppression, "when a user lands on the subpage of a property that is listed for sale . . . both the sale price and the Zestimate are immediately visible and prominently displayed, side by side." *Id*. ¶ 4.[8]  Plaintiff contends this is a competitive disadvantage and alleges that "a visitor spends, on average, 15.84 seconds viewing a given property's subpage" and that "on information and belief" that time "is spent looking at photographs of a given home as opposed to scrolling through written information in search of the Zestimate." *Id*. ¶ 5.

Plaintiff surmises that the Zestimate Suppression achieved through the Zestimate Agreements anticompetitively tilts "the playing field in favor of the "Co-Conspirator Brokers." *Id*. ¶ 113.  Plaintiff further claims that the "[s]elective concealment" of the Zestimate "disrupts the proper functioning of a competitive marketplace." *Id*. ¶ 137.  Plaintiff alleges that Zestimate Suppression "has permitted the Co-Conspirator Brokers to insulate themselves from competition" leaving the Co-Conspirator Brokers "otherwise free from . . . concerns that other brokers and

---

[7] As discussed in note 6, the SAC fails to indicate how this alleged competitive advantage was impacted when Zillow switched to the "View Zestimate" link.

[8] Again, Plaintiff also alleges Zillow has altered the placement of the Property's "and *others*'" Zestimates such that the Zestimate no longer "appear[ed] at the top of the property page" under the listing price; instead, a link with "View Zestimate" appeared (presumably providing the Zestimate if the link was selected). *Id*. ¶ 159.  It is therefore unclear to the Court, based on Plaintiff's allegations, what an internet user actually sees when viewing the Property.

individual home sellers address when faced with a prominently displayed Zestimate." *Id.* ¶ 141. Plaintiff also alleges that the Zestimate Suppression suppresses "critical price information" (apparently the Zestimates) on the Co-Conspirator Brokers' listings. *Id.* ¶ 91. *See also id.* at 7 ("The Zestimate Agreements are agreements to suppress pricing information[.]"); ¶ 8 ("The Zillow Agreements unreasonably restrain open price competition by suppression and reducing the output of pricing information."). In this regard, the SAC is seemingly contradictory in that it alleges that the Zestimates are "critical price information" but also that the Zestimate as to the Property is apparently inaccurate.

Plaintiff claims that since 2017, "Co-Conspirator Brokers that have had the benefit of Zestimate Suppression . . . have sold at least eight high-end homes in the town of Cresskill" as compared to two sales by brokers operating without the benefit of Zestimate suppression. *Id.* ¶ 164. As a result, Plaintiff asserts that, as a consumer of services from non-Co-Conspirator Brokers, it "has paid supracompetitive quality adjusted prices and, in turn, received a reduced quality of service." *Id.* Plaintiff further alleges it was injured by "the lost opportunity to sell 142 Hoover, lost profits and continuing carrying costs such as property taxes, insurance, landscaping, utilities and other expenses related to owning an investment property." *Id.* ¶ 35.

## II.   PROCEDURAL HISTORY

Plaintiff filed its original Complaint on January 1, 2018 alleging five causes of action: (1) conspiracy to restrain trade under Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) conspiracy to restrain trade under the New Jersey Antitrust Act, N.J.S.A. 56:9-3; (3) fraud under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 *et seq.*; (4) slander of title/product disparagement under New Jersey common law; and (5) interference with prospective economic

advantage under New Jersey common law.  D.E. 1 ¶¶ 97-127.  Zillow filed a motion to dismiss

Plaintiff's Complaint, D.E. 11, which the Court granted, MTD Op.

The Court provided Plaintiff an opportunity to file an amended complaint, which Plaintiff

filed on March 29, 2019, alleging only two of its previous five counts: (1) conspiracy to restrain

trade under Section 1 of the Sherman Act, and (2) conspiracy to restrain trade under the New Jersey

Antitrust Act.  D.E. 22 ("FAC").  Zillow again moved to dismiss Plaintiff's FAC, D.E. 24, which

the Court granted, 2d MTD Op.

The Court provided Plaintiff an opportunity to file a second amended complaint, which

Plaintiff filed on June 1, 2020, again alleging two counts: (1) conspiracy to restrain trade under

Section 1 of the Sherman Act, and (2) conspiracy to restrain trade under the New Jersey Antitrust

Act.  D.E. 40.  The current motion followed.  Zillow moved to dismiss the SAC, D.E. 42, which

Plaintiff opposed, D.E. 49.  Defendants filed a reply.  D.E. 50.

On February 25, 2021, Plaintiff filed a letter as to Zillow's motion to dismiss.  *See* D.E.

51.  Plaintiff requested that "the motion record be supplemented" with the "Majority Staff Report

and Recommendations of the Investigation of Competition in Digital Markets" (the "Report")

authored by the United States House of Representatives' Subcommittee on Antitrust, Commercial

and Administrative Law (the "Subcommittee") of the Committee on the Judiciary.  *Id*. at 1.

Plaintiff represents that the Subcommittee issued the Report after the briefing on the motion to

dismiss concluded.  *Id*.  However, Plaintiff admits the Report was issued on October 6, 2020, so it

appears Plaintiff waited several months to bring the report to the Court's attention.  Plaintiff also

ignores that, in deciding a motion to dismiss, a district court may only consider "exhibits attached

to the complaint and matters of public record" as well as "an undisputedly authentic document that

a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the

document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Plaintiff's letter fails to indicate under which exception the Report falls. Accordingly, the Court did not consider the Report in resolving Zillow's motion to dismiss.

Even if the Court considered the Report, Plaintiff's letter does not point to any specific findings that would be relevant to the issues presented in the current motion. Plaintiff represents that the Subcommittee made a general finding that "dominant platforms in the digital economy 'exploit gatekeeper power to dictate terms and extract concession that no one would reasonably consent to in a competitive market." *Id*. Plaintiff further represents that the Subcommittee characterized "the antitrust injury/antitrust standing doctrines as well as the heightened pleadings standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) as 'significant obstacles' erected by courts that 'hamper[] private antitrust plaintiffs.'" D.E. 51 at 2. To the extent Plaintiff is asking the Court to disregard binding precedent, the Court is without authority to do so.

## III.   STANDARD OF REVIEW

### A. Rule 12(b)(1)

In deciding a Rule 12(b)(1) motion for lack of subject-matter jurisdiction, a court must first determine whether the party presents a facial or factual attack because the distinction determines how the pleading is reviewed. A facial attack "contests the sufficiency of the complaint because of a defect on its face," whereas a factual attack "asserts that the factual underpinnings of the basis for jurisdiction fails to comport with the jurisdictional prerequisites." *Elbeco Inc. v. Nat'l Ret. Fund*, 128 F. Supp. 3d 849, 854 (E.D. Pa. 2015) (quoting *Moore v. Angie's List, Inc.*, 118 F. Supp. 3d 802, 806 (E.D. Pa. 2015)).

For a facial attack, "the Court must consider the allegations of the complaint as true," much like a Rule 12(b)(6) motion to dismiss. *Bd. of Trs. of Trucking Emps of N. Jersey Welfare Fund,*

*Inc. v. Caliber Auto Transfer, Inc.*, No. 09-6447, 2010 WL 2521091, at *8 (D.N.J. June 11, 2010) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006)). However, for a factual attack, "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), *holding modified by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003). The burden is on the plaintiff to prove that the Court has jurisdiction. *Id.*

As for a district court's power to hear the case, "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). One key aspect of this case-or-controversy requirement is standing. *See id.* "The standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa.*, 757 F.3d at 360. To establish standing, a plaintiff must satisfy a three-part test, showing: "(1) an 'injury in fact,' *i.e.,* an actual or imminently threatened injury that is 'concrete and particularized' to the plaintiff; (2) causation, *i.e.,* traceability of the injury to the actions of the defendant; and (3) redressability of the injury by a favorable decision by the Court." *Nat'l Collegiate Athletic Ass'n v. Gov. of N.J.*, 730 F.3d 208, 218 (3d. Cir. 2013).

**B. Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims."  *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim.  *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

## IV.   ANALYSIS

### A.  Article III Standing

The Court previously found that Plaintiff's FAC failed to adequately establish Article III standing.  2d MTD Op. at 10-11.  Defendants argue that the same infirmity plagues the SAC.  Br. at 8-11.  A plaintiff seeking to establish Article III standing "must demonstrate '(1) an injury-in-fact, (2) a *sufficient causal connection* between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.'"  *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (emphasis added) (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 358-59 (3d Cir. 2015) (internal quotations omitted and punctuation

modified)).  The first element, an injury-in-fact, requires Plaintiff to show "'the invasion of a concrete and particularized legally protected interest' resulting in harm 'that is actual or imminent, not conjectural or hypothetical.'"  *Finkelman*, 810 F.3d at 193 (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014)).  The second element, causation, "requires the alleged injury to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"  *Finkelman*, 810 F.3d at 193 (quoting *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137-38 (3d Cir. 2009)).  The Third Circuit has explained that Article III's causation requirement is "akin to 'but for' causation in tort and may be satisfied 'even where the conduct in question might not have a proximate cause of the harm.'"  *Finkelman*, 810 F.3d at 193 (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013)).  The third element, redressability, requires a plaintiff "to show that it is 'likely, as opposed to merely speculative,' that the alleged injury will be redressed by a favorable decision."  *Finkelman*, 810 F.3d at 194 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

"When assessing standing on the basis of the facts alleged in a complaint," courts "apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim."  *Id.*  (citing *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F. 3d 235, 243 (3d Cir. 2012)).  The Third Circuit has described this process as a three-step inquiry:

> First, we "tak[e] note of the elements a plaintiff must plead to state a claim" – here, the three elements of Article III standing. Second, we eliminate from consideration any allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Third, "where there are well-pleaded factual allegations, [we] assume their veracity and then determine whether they plausibly" establish the prerequisites of standing.  In conducting this analysis, we are mindful of the Supreme Court's teaching that all aspects of a complaint must rest on "well-pleaded factual allegations" and not "mere conclusory statements."  Thus, to survive a motion to dismiss for lack of standing, a plaintiff "must allege facts

that affirmatively and plausibly suggest that it has standing to sue."
Speculative or conjectural assertions are not sufficient.

*Id*. (internal citations omitted).[9]   With respect to causation, the Third Circuit has explained that

[t]he causation element of standing requires a plaintiff to allege facts sufficient to show that his or her injury is "fairly traceable" to the alleged wrongdoing of the defendant. We have explained that traceability requires, at a minimum, that the defendant's purported misconduct was a "but for" cause of the plaintiff's injury.

*Id*.

Here, Plaintiff's injury-in-fact is alleged as follows:

Plaintiff, which is in the business of buying, renovating, and selling homes, has suffered the following business injuries: the lost opportunity to sell 142 Hoover, lost profits and continuing carrying costs such as property taxes, insurance, landscaping, utilities, and other expenses related to owning an investment property.

Plaintiff has also suffered injuries in fact through its having paid supracompetitive quality-adjusted prices for brokerage services and having received a lower quality of services.

SAC ¶¶ 35-36; *see also* Opp. at 6.

Defendants argue Plaintiff fails to plead Article III standing because the Court previously found that the first injury could not provide Article III standing for lack of causation and that the second, newly alleged injury, is not sufficiently pled.  Br. at 8-11.  Plaintiff responds that the allegations in the SAC satisfy the "but for" requirement for pleading causation under the Article

---

[9] In this context, the Third Circuit has acknowledged that "[s]ome of our sister circuits have questioned how well the 'plausibility' standard of *Iqbal* and *Twombly* maps onto standing doctrine."  *Finkelman*, 810 F.3d at 194 n.55 (citing *Maya v. Centex Corp.,* 658 F.3d 1060, 1068 (9th Cir. 2011), and *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 225 (2d Cir. 2008)).  The Circuit continued, "[w]ithout wading too deeply into this particular thicket, we are content to say that, even when reviewing only the bare allegations of a complaint, *Iqbal* and *Twombly* teach that standing cannot rest on mere 'legal conclusions' or 'naked assertions.'"  *Id*.

III standing analysis.  Opp. at 7-11.  Plaintiff specifically argues that the "price anchoring effects" of the location of the Zestimate are the cause of its harm – not the Zestimate itself.  *Id*. at 11.

As to the newly alleged injury – Plaintiff's payment of "supracompetitive" prices – the Court finds that Plaintiff has failed to plausibly allege an injury-in-fact.  Plaintiff now claims that it was injured "through its having paid supracompetitive quality-adjusted prices for brokerage services and having received a lower quality of services."  SAC ¶ 36.  This conclusory allegation is repeated throughout the SAC, *id.* ¶¶ 19, 20, 36, 37, 124, 146, and is not entitled to the presumption of veracity.  *Finkelman*, 810 F.3d at 194.  Plaintiff provides no other factual details concerning this injury.  For example, Plaintiff does not allege the amount it paid for services or facts from which the Court can infer that the price Plaintiff paid was "supracompetitive." Accordingly, the Court finds that this allegation is insufficient to establish Article III standing.[10]

The other alleged injury – the costs associated with Plaintiff's inability to sell the Property, SAC ¶ 35 – is the same as alleged in the FAC.  *See* FAC ¶ 126.  The Court previously found that, assuming the lost profits constituted an injury-in-fact, Plaintiff failed to adequately plead causation for that injury.  2d MTD Op. at 7-11.  "The causation element of standing requires a plaintiff to allege facts sufficient to show that his or her injury is 'fairly traceable' to the alleged wrongdoing of the defendant."  *Finkelman*, 810 F.3d at 198.  Such "traceability requires, *at a minimum*, that the defendant's purported misconduct was a 'but for' cause of the plaintiff's injury."  *Id.* (emphasis

---

[10] Plaintiff also alleges that as a result of Zillow's action, Plaintiff faces "decreased quality of brokerage services."  *See, e.g.,* SAC ¶ 123.  This conclusory allegation is only vaguely explained as meaning that Plaintiff "has received a lower quality of broker service, which is evidenced by the inability to sell its property when compared against similarly priced properties within the Triboro Market during the relevant time period, which have been more likely to sell."  *Id.* ¶ 124. Besides the circular reasoning employed (Plaintiff's brokers are of lower quality because they cannot sell the Property), Plaintiff fails to allege any facts demonstrating what it means by "similarly priced," "the relevant time period," or "more likely to sell."

added).  Plaintiff must establish that "but for" Defendants' Zestimate Agreements with other brokers, Plaintiff would not have suffered lost profits from its inability to sell the Property.

This Court previously found that "Plaintiff's alleged causal connection between its injury and Defendants' conduct appears to concern the *value* of the Property's Zestimate rather than the *location* of the Property's Zestimate, and certainly does not appear to concern the location of Zestimates on the *co-conspirators'* property listings." 2d MTD Op. at 10 (emphasis in original). The SAC contains the same allegations concerning the prominence of pricing information as in the FAC which this Court previously found insufficient.  *Compare* SAC ¶ 78 *with* FAC ¶ 81.  And as in the FAC, here Plaintiff complains that the negative pricing information on *its* page dissuades customers from purchasing the Property.  *Compare* SAC ¶ 155 *with* FAC ¶ 112; *see also* SAC ¶ 6 (alleging "[d]iscrepancies between a property's Zestimate . . . substantially impacts the attitude and behavior of buyers in the luxury market.").

More importantly, Plaintiff does not allege that it lost any potential buyers to a comparable property sold by one of the Co-Conspirator Brokers in which the Zestimates were in a less prominent position.  Plaintiff only indicates that two potential buyers informed Plaintiff that when they viewed the Property in 2017, they "were turned off from considering a potential purchase of the property based on the discrepancy between the listing price and the Zestimate."  *Id.* ¶ 155. Putting aside the vagaries of this allegation, the SAC does not indicate that the buyers bought a comparable property at a comparable price from a Co-Conspirator Broker.  Moreover, Plaintiff has characterized the Zestimate Agreements as, among other things, "depriving *consumers* access to price information as displayed in the Zestimate."  SAC ¶ 139(d) (emphasis added).  As pled, this alleged injury impacts consumers, not sellers like Plaintiffs.  Accordingly, the SAC adds no

14

allegations to alter the Court's previous finding that Plaintiff failed to adequately plead causation as to its lost profit injury.  MTD Op. at 7-11.

Plaintiff also added a new allegation that "[o]n information and belief, Zillow offers Zestimate Suppression to only one brokerage firm within a given geographic market."  *Id*. ¶ 116. However, this statement is conclusory as Plaintiff fails to set forth the facts that give rise to Plaintiff's "belief" that such an agreement exists.  A plaintiff may plead facts upon information and belief "where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control – so long as there are no boilerplate and conclusory allegations and plaintiffs accompany their legal theory with factual allegations that make their theoretically viable claim plausible."  *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)) (internal punctuation omitted).  Here, clearly any Zestimate Agreement between Zillow and Realogy is in the possession of Zillow.  But Plaintiff has pled *no* facts indicating the basis for its belief.

Plaintiff continues that a company called "Realogy" is the sole brokerage firm to which Zillow offers Zestimate Suppression to in the Triboro Market and that "[t]here is either an express or *de facto* agreement between Zillow and Realogy that Realogy would be the only firm to have availability of Zestimate Suppression during the course of the agreement."  SAC ¶¶ 117-119. Plaintiff provides no other facts to support these allegations.  And it certainly appears that Plaintiff has access to additional evidence.  For example, the SAC indicates that as of May 1, 2020, Realogy was the broker for 36 of 49 listings in the Triboro Market as to homes with an asking price of $2,000,000 or more.  *Id.* ¶ 121.  It would appear that Plaintiff could allege, if accurate, that only

the Zestimates for the Realogy listings are not prominently displayed on the Zillow Website.  Thus, these allegations are not entitled to the presumption of truth.

However, even more fundamentally, Plaintiff's causation argument (and, indeed, its theory of the case) is based on the premise that Zestimates are considerably lower than the asking price.[11] With this premise in mind, Plaintiff's essential theory is that it is being treated unfairly, when compared to the Co-Conspirator Brokers, because the Zestimate for its Property is more prominent than the Zestimates for the properties of the Co-Conspirator Brokers.[12]   Yet, the SAC lacks plausible facts to support this theory.   For example, Plaintiff alleges that "[s]ince 2017 Co-Conspirator Brokers[13] that have had the benefit of Zestimate Suppression through Zestimate Agreements have sold at least eight high-end homes in the town of Cresskill, as compared to just two such sales by Unaffiliated Brokers that do not have the benefit of Zestimate Suppression." SAC ¶ 164.  This allegation lacks sufficient factual support to adequately establish causation.  For example, the allegation fails to indicate how many homes were on the market, the prices that the homes were listed for, the actual selling prices of the homes, the number of homes that the Co-Conspirator Brokers had vis-à-vis the unaffiliated brokers, and, critically, the Zestimates for each home when compared to the asking price and final sale price.  Plaintiff does not plausibly plead but-for causation.

---

[11] It can be reasonably inferred that Plaintiff would not have the same concern if the Zestimate was *higher than* the asking price because the asking price would then appear to be a relative bargain.

[12] As discussed in notes 5, 6, and 7, the current prominence of the Zestimate is, at best, ambiguous, based on the allegation in the SAC.

[13] In alleging "Co-Conspirator Brokers," Plaintiff seemingly contradicts itself in the SAC because elsewhere it claims that there is only one Co-Conspirator Broker, Realogy.

**B.  Sherman Act, 15 U.S.C. § 1**[14]

Zillow also argues that Plaintiff has failed to adequately allege antitrust standing and antitrust injury.  Br. at 11-15.  The Court previously found that, even assuming Plaintiff had Article III standing, Plaintiff failed to establish antitrust standing.  2d MTD Op. at 11.  Like the Article III analysis, the Court found that Plaintiff had failed to sufficiently allege causation to establish antitrust standing.  *Id.* at 14-15.

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  To maintain a claim under Section 1, a plaintiff must allege: (1) that the defendant was a party to a "contract, combination . . . or conspiracy" (2) with an unlawful objective to put an "unreasonable restraint on competition."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998).  The unlawful objective must relate to antitrust activities.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 331.  In other words, an unlawful objective separate from antitrust conduct may be otherwise actionable, but not under the antitrust statutes.  *Id.*

---

[14] Plaintiff brings claims under both the Sherman Act, 15 U.S.C. § 1, SAC ¶¶ 167-171, and the New Jersey Antitrust Act, N.J.S.A. 56:9-3, *id*. ¶¶ 172-74.  The Court previously found "the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes" and determined to analyze the claims together.  2d MTD Op. at 11, n. 7 (citing *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016) (citation omitted)).  The parties appear to still agree on this point.  Br. at 20; *see generally* Opp. at 18-29 (failing to separately evaluate its New Jersey Antitrust Act argument, instead implicitly relying on its Sherman Act argument).  The Sherman Act claim and its analogous New Jersey counterpart will be analyzed together.

Moreover, "even [if] a plaintiff has established Article III standing, antitrust standing remains as a prerequisite to suit, focus[ing] on the nature of the plaintiff's alleged injury, [and] asking whether it is of the type that the antitrust statute was intended to forestall." *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 269 (3d Cir. 2016) (internal quotations omitted). Antitrust standing, unlike Article III standing, is a "prudential limitation" that does not affect the Court's subject matter jurisdiction over a matter, but rather "prevents a plaintiff from recovering under the antitrust laws."[15] *Ethypharm S.A. v. Abott Labs.*, 707 F.3d 223, 232 (3rd Cir. 2013); *see also Sullivan v. DB Invs. Inc.*, 667 F.3d 273, 307 (3d Cir. 2011) ("[L]ack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court") (citing *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008))).

The Supreme Court in *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters* articulated several factors to consider when determining whether a plaintiff has antitrust standing. 459 U.S. 519, 535-38 (1983). Since then, the Third Circuit has "organized those factors . . . into the following multifactor test":

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Ethypharm S.A. France*, 707 F.3d at 232-33 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993)). In particular, "[p]rivate plaintiffs pursuing claims

---

[15] This Court discussed the distinction between antitrust standing and Article III standing in its prior opinion. D.E. 33 at 12, n. 8.

under § 1 of the Sherman Act have standing when they suffer an *antitrust injury* that is *causally related* to the defendants' allegedly illegal anti-competitive activity." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (emphasis added). In this context, antitrust standing "focuses on the nature of the plaintiff's alleged injury,' [and] ask[s] 'whether it is of the type that the antitrust statute was intended to forestall.'" *Hartig Drug Co. Inc.*, 836 F.3d at 269; *see also Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 344 (3d Cir. 2018) ("Appellants allege their own injury, namely, financial hardship. Tellingly, they fail to aver an antitrust injury, such as a negative impact on consumers or to competition in general, let alone any link between this impact and the harms Appellants have suffered."), *cert. denied sub nom. Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 139 S. Ct. 211 (2018).

The Court previously found that "Defendants' alleged antitrust conduct is Defendants entering into Zestimate Agreements with certain brokers so that the Zestimates for those brokers' real estate listings appear less prominently on their listing pages." 2d MTD Op. at 14. The Court reasoned that Plaintiffs' injury was of a "personal nature" and therefore held it was not an injury "of the type that the antitrust statute was intended to forestall." *Id.* (citing *Hartig Drug Co. Inc.*, 836 F.3d at 269). Defendants argue that the Court should abide by its previous holding here because "Plaintiff does not allege any new facts capable of demonstrating how its own loss of profits reflected a broader harm to competition in the market," Br. at 12-13, and because it is "the law of this case," Reply at 4. Plaintiff argues that lost profits can constitute antitrust injuries. Opp. at 14-15 (citing *Pace Electronics, Inc. v. Canon Computer Systems, Inc.*, 213 F.3d 118, 122 (3d Cir. 2000); *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 429 (S.D.N.Y. 2014); *Zschaler v. Claneil Enterprises, Inc.*, 958 F. Supp. 929 (D. Vt. 1997)).

19

Plaintiff misconstrues the Court's previous holding. The Court did not categorically rule that lost profits could never satisfy antitrust injury; instead, the Court concluded that Plaintiff's specific injury here – its inability to sell the property due to a discrepancy between the Zestimate and the alleged appraised value – was not an injury of the type the antitrust statute was intended to stop. D.E. 33 at 14; *see also DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 429 (S.D.N.Y. 2014) ("A claim for lost profits can constitute a cognizable antitrust injury in the *appropriate* case." (emphasis added)). Thus, although Plaintiff is correct that the *Pace Electronics*, court held that the plaintiff could base its antitrust injury on "lost profits," that case is distinguishable. *Pace Electronics* involved allegations that the defendant terminated the plaintiff's ability to distribute the defendant's goods because the plaintiff refused to adhere to a vertical, minimum-price-fixing agreement between defendant and a third party. *See Pace Electronics, Inc.*, 213 F.3d at 122-23. There is no allegation of a price fixing conspiracy here. Indeed, there are insufficient allegations that the Zestimates are routinely lower than the asking price or that the Zestimates on Co-Conspirator Brokers' listings were comparable to the alleged discrepancy between Plaintiff's Zestimate and asking price.

*DNAML* is similarly inapt. That case involved allegations of an agreement between Apple and major book publishers "to guarantee that [they] would lower the retail price of each e-book in Apple's iBookstore to match the lowest price offered by any other retailer [and] . . . [to] create[] pricing tiers that set caps for the maximum pricing for e-books." *DNMAL Pty, Ltd.*, 25 F. Supp. 3d at 426. The agreement "eliminated" the plaintiff retailer's "ability to compete on price." *Id.* The court held that the retailers that wished to compete on price but were unable to had suffered an antitrust injury. *Id.* at 430. In rejecting the Defendants' argument that overcharges were the only kind of damages available to remedy price-fixing conspiracies, the court found that "[a] claim

for lost profits can constitute a cognizable injury in the *appropriate* case." *Id*. (emphasis added).

Unlike *DNMAL*, Plaintiff does not allege a price-fixing conspiracy. Plaintiff does not plausibly

allege that it was somehow foreclosed from competition on price.

*Zschaler*, is also distinguishable. *See* 958 F. Supp. at 940. There, the plaintiffs pleaded

monopolization-based claims. *Id*. at 943-47. Plaintiff does not allege a monopoly claim here.

Moreover, the *Zschaler* court found a direct connection between the defendants' monopolization

tactics and the harm to the plaintiffs, *id*. at 940, whereas here the Court has found no plausible

factual connection between the alleged anticompetitive conduct – the Zestimate Agreements – and

the injury Plaintiff allegedly suffered in failing to sell the property. *See also* 2d MTD Op. at 13-

14.

However, assuming that Plaintiff has adequately pled that its lost profits are an appropriate

antitrust injury in this case, the bigger issue (as with Article III standing) is the lack of plausible

allegations as to causation. The Court made this finding in its earlier Opinion. *Id.* at 14 ("Plaintiff

fails to demonstrate a casual link between the purported antitrust effect of the Zestimate

agreements and the harm Plaintiff has suffered." (citations omitted)). The SAC suffers from the

same infirmity. Plaintiff now claims that its antirust injury is that it "paid supracompetitive quality-

adjusted prices for brokerage services" that were "lower quality." SAC ¶ 36. However, as

discussed above, this is a conclusory allegation not entitled to the presumption of veracity.

*Finkelman*, 810 F.3d at 194. The SAC's causation as to the alleged antitrust injury is insufficiently

pled.

The parties next turn to the SAC's allegations that the Zestimate Agreements unfairly tilt

"the competitive playing field in favor of sellers that list homes through Co-Conspirator Brokers,"

SAC ¶ 15; *see id*. ¶ 113, and give the Co-Conspirator Brokers "an unequal advantage over their

rivals." *See id.* ¶ 77.  This Court found similar allegations in the FAC were "at best, speculative and conclusory."  2d MTD Op. at 14.  The Court reasoned that such allegations depended on the assumptions that (1) "the Zestimates are always less than the asking price" and (2) that "the co-conspirator brokers have been able to sell comparable properties (to the Property) at a similar price (to Plaintiff's asking amount) in a shorter amount of time."  *Id.*  And the Court found that the allegations in the FAC failed to adequately support either conclusion.  *Id.*

Plaintiff has attempted to add allegations concerning the second assumption.  *See* SAC ¶ 164.  Specifically, Plaintiff alleges that, since 2017, Co-Conspirator Brokers that use Zestimate Suppression "have sold at least eight high-end homes in the town of Cresskill, as compared to just two such sales by Unaffiliated Brokers that do not have the benefit of Zestimate Suppression."  *Id.* Plaintiff further contends that "[o]n information and belief, these patterns persist across the Triboro Market."  *Id.* ¶ 165.  As discussed above, these allegations standing alone are inadequate.  In addition, the Court previously reasoned that "even taking [the FAC's allegations of market wide harm] as true . . . Plaintiff's alleged injury does not reflect any of the antitrust injuries Plaintiff vaguely argues the Zestimates Agreements cause."  2d MTD Op. at 15.  Here, Plaintiff attempted to allege an injury arising from these market-wide harms:  that it "paid supracompetitive quality-adjusted prices for brokerage services" that were "lower quality."  SAC ¶ 36.  Again, these conclusory allegations are inadequate.  Thus, Plaintiff still fails to adequately plead causation to establish antitrust standing.

### C. Dismissal with Prejudice and Sanctions

Defendants argue that the SAC should now be dismissed with prejudice.  Br. at 21-22. Defendants also seek sanctions pursuant to this Court's "inherent power."  Br. at 21-22.  The Court does not find that Plaintiff is litigating in bad faith and therefore denies the motion for sanctions.

A district court may dismiss with prejudice, thus denying leave to amend only if (a) the moving party's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the non-moving party or (b) the amendment would be futile. *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984); *see also Tekman v. Berkowitz,* 639 F. App'x 801, 807 (3d Cir. 2016) (affirming district court's decision dismissing case with prejudice and stating "[a] district court may deny leave to amend on the basis of 'undue delay, bad faith, prejudice, or futility.'" (citation omitted)). Here, Plaintiff has been granted two opportunities to cure and the Court finds that any further attempt to cure would be futile. In granting the first motion to dismiss, the Court found that the antitrust allegations were insufficient because Plaintiff had not cited to any authority sustaining an antitrust action under similar circumstances and because Plaintiff had taken inconsistent positions in its Complaint and briefing. MTD Op. at 12-13. In granting the second motion to dismiss, the Court found that Plaintiff had not sufficiently alleged "but for" causation as to Article III standing, 2d MTD Op. at 10-11, and had not plausibly alleged antitrust standing, *id.* at 14-16.

Whether it be Article III causation, antitrust standing causation, or legal causation, Plaintiff falls well short of plausible allegations. As noted, at its core, Plaintiff's theory is that it has not been able to sell the Property due to the prominence of the Zestimate near its asking price, while Co-Conspirator Brokers have a competitive advantage because the Zestimate is not prominently featured near their asking prices.[16] To be plausible, Plaintiff would need to sufficiently allege that the Co-Conspirator Brokers' properties feature a similar asking price as Plaintiff, that the

---

[16] And this theory does not account for the change to placement of the Zestimates as alleged in the SAC. Plaintiff indicates that Zillow has altered the placement of the Property's "and *others*'" Zestimates such that the Zestimate no longer "appear[ed] at the top of the property page" under the listing price; instead, a link with "View Zestimate" appeared (presumably providing the Zestimate if the link was selected). *Id.* ¶ 159.

Zestimates for both Plaintiff's and the Co-Conspirator Brokers' properties are comparable, and that the reason that the Co-Conspirator Brokers were able to sell more quickly than Plaintiff was because of the placement of the Zestimates.[17]  Plaintiff provides no plausible allegations in this regard, and it is clear that, at a minimum, Plaintiff has access to the Zestimates for the Co-Conspirator Brokers' properties because those Zestimates are on the Zillow Website.  Thus, the Court concludes that Plaintiff does not make sufficient allegations because it is unable to do so. As a result, any attempted amendment would be futile.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss, D.E. 42, is granted.  The matter is dismissed with prejudice.  An appropriate Order accompanies this Opinion.

Date: March 4, 2021

John Michael Vazquez, U.S.D.J.

---

[17] Plaintiffs would also have to sufficiently allege the actual sales price of Co-Conspirator Brokers' properties.  If those properties were sold at a discount from the asking price, Plaintiff would face another causation obstacle.